[No. C059985. Third Dist. Aug. 11, 2010.]

MATTHEW SNATCHKO, Plaintiff and Appellant, v.
WESTFIELD LLC et al., Defendants and Respondents.

472

## COUNSEL

Pacific Justice Institute, Kevin T. Snider, Matthew B. McReynolds; McKinley & Smith and Timothy M. Smith for Plaintiff and Appellant.

David L. Llewellyn, Jr., for Missionary Church of the Disciples of Jesus Christ as Amicus Curiae on behalf of Plaintiff and Appellant.

Center for Law & Religious Freedom, Kimberlee Wood Colby; Crowell & Moring, Bruce Zabarauskas, Frederick W. Claybrook, Jr., and James Maisano for Christian Legal Society as Amicus Curiae on behalf of Plaintiff and Appellant.

Horvitz & Levy, Jeremy B. Rosen, Stephen E. Norris; Katten Muchin Rosenman, Thomas J. Leanse, Stacey McKee Knight and Regina L. Katz for Defendant and Respondent Westfield LLC.

Manning & Marder, Kass, Ellrod, Ramirez, Darin L. Wessel and Sejal Ojha for Defendant and Respondent Professional Security Consultants.

## OPINION

**CANTIL-SAKAUYE, J.**—In this case we conclude the rules of a large regional shopping mall that prohibit peaceful, consensual, spontaneous conversations between strangers in common areas of the mall about topics that

are not related to the activities of the mall, its tenants or the noncommercial sponsored activities of the mall or its tenants are content-based rules that do not withstand a strict scrutiny analysis. The rules are unconstitutional on their face under article I, section 2 of the California Constitution, the California constitutional provision which guarantees the right to free speech. (*Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850 [69 Cal.Rptr.3d 288, 172 P.3d 742] (*Fashion Valley*); *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341] (*Pruneyard*), affirmed *sub nom. Pruneyard Shopping Center v. Robins* (1980) 447 U.S. 74 [564 L.Ed.2d 741, 100 S.Ct. 203].) As the trial court granted the motion for summary adjudication of defendants Westfield LLC, Westfield America, Inc., Urban Roseville LLC, and Roseville Shoppingtown, LLC (together Westfield), based on an erroneous finding that Westfield's rules were reasonable time, place, and manner restrictions that were content neutral, we shall reverse the judgment in favor of defendants and direct the trial court to vacate its order granting summary adjudication and enter a new order denying Westfield's motion. We also conclude the trial court erred in striking plaintiff's prayer for attorney fees and direct the court to allow plaintiff to seek fees as may be appropriate at the conclusion of the case.

## BACKGROUND

Hoping for opportunities to share his Christian faith, Matthew Snatchko, a youth pastor, often went to a large regional shopping mall—the Galleria in Roseville, owned, operated and managed by Westfield (hereafter the Galleria or the mall).[1] While he was in the common area of the mall one evening, Snatchko approached three young women in their late teens, asked them if they were willing to talk with him, and upon receiving their consent, engaged them in conversation, which included with their permission his sharing with them principles of his faith. He did not raise his voice or otherwise create a scene. He did not distribute any literature. He did not solicit money or other contributions of any kind. He did not ask them to join his church. He did not block mall patrons.

Nevertheless, a nearby store employee called the mall's security office and requested they investigate Snatchko's actions. A security officer responded and observed what he believed to be nervous behavior by the young women. Snatchko did not observe any expression or conduct by the women indicating they were nervous or that they did not want to continue the conversation. It appeared to Snatchko that the security officer stopped and listened to his conversation with the women.

---

[1] The Galleria is a two-story indoor shopping center containing approximately 1,034,337 square feet of gross leasable retail space. It contains 137 retail tenants and four major department stores.

The security officer approached and asked Snatchko to stop what he was doing or leave the mall. When Snatchko refused, the security officer called for backup. A senior security officer responded and instructed Snatchko to leave. As Snatchko continued to refuse, the security officers forcibly placed Snatchko under citizen's arrest, handcuffed him and escorted him to the security office where they turned him over to Roseville police.

Snatchko was booked and released by the police. When he appeared at arraignment, however, all charges were dismissed. The Placer County District Attorney later stipulated Snatchko was factually innocent of the charges and the Placer County Superior Court issued an order of factual innocence.

Snatchko filed this action against Westfield, Professional Security Consultants (PSC)—the private security company employed by Westfield, and Richard Flores—the senior security officer who arrested and handcuffed him (together, defendants). Snatchko's first amended complaint alleged causes of action for false imprisonment, assault, battery, intentional infliction of emotional distress, negligence, malicious prosecution, violation of civil rights under the Unruh Civil Rights Act (Civ. Code, § 51), injunctive relief, and declaratory relief.

In relevant part, Snatchko's first amended complaint alleged defendants made the mall "inaccessible to persons who, as part of their religious conduct and expression exercise their rights of free speech and faith by conversationally speaking with other persons within the Galleria on issues of faith." In his cause of action for injunctive relief, Snatchko alleged "no constitutionally sufficient interest justifies defendants' discrimination against plaintiff based on the content or subject matter of his conversational speech. In fact, no defendant expressed to plaintiff any explanation for denying him the right to speak conversationally in the Galleria on a subject matter of his choice. Defendants' decision to refuse plaintiff's request for use of the Galleria was wholly arbitrary and capricious and based solely on objection to the subject matter of plaintiff's conversation." In his cause of action for declaratory relief, Snatchko alleged an actual controversy "in that plaintiff contends that defendants' rules, policies, and practices concerning the use of the Galleria for speech activities, as described herein, violate plaintiff's rights of freedom of speech . . . under the California Constitution." Snatchko sought "a declaration as to the validity of defendants' rules, policies and practices, as described in this Complaint, both on their face and as applied to plaintiff's free speech activities."

Westfield moved for summary adjudication of Snatchko's claims for intentional infliction of emotional distress, negligence, violation of his civil rights, injunctive, and declaratory relief. Westfield contended such claims

failed because they were premised on the denial of Snatchko's constitutional rights when in fact Westfield lawfully adopted and enforced reasonable time, place, and manner rules governing noncommercial expressive activity at its privately owned shopping mall.

The trial court granted Westfield's motion, finding, "as a matter of law, the regulations imposed by [Westfield] do not constitute an impermissible restriction on [Snatchko's] rights under the California Constitution. Rather, the regulations are merely reasonable time, place, and manner restrictions that are content-neutral." Snatchko and defendants subsequently stipulated to entry of judgment against Snatchko on all causes of action to facilitate appeal of the trial court's decision granting summary adjudication. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 401–402 [87 Cal.Rptr.2d 453, 981 P.2d 79].) This appeal followed.[2]

## DISCUSSION

### I.

### Standard of Review

The standard of review for a trial court's decision to grant summary adjudication is well established. "A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f)(1).) A moving defendant has met his or her burden of showing that a cause of action has no merit by establishing that one or more elements of a cause of action cannot be established or that there is a complete defense. (Code Civ. Proc., § 437c, subd. (*o*); see *Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 160 [89 Cal.Rptr.3d 495].)

We independently review an order granting summary adjudication. (*Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 87 [50 Cal.Rptr.3d 266].) In determining whether there is a triable issue of material fact, we consider all the evidence set forth by the parties except that to which objections have been made and properly sustained. (Code Civ. Proc., § 437c, subd. (c); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) "[W]e strictly construe the moving party's evidence and liberally construe the opposing party's evidence." (*Sababin v. Superior Court, supra*, at p. 88; accord, *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123].)

---

[2] We granted requests of the Christian Legal Society and the Missionary Church of the Disciples of Jesus Christ to file amicus curiae briefs in support of Snatchko's appeal.

We keep in mind that the pleadings frame the issues to be resolved. " 'The purpose of a summary judgment [adjudication] proceeding is to permit a party to show that material factual claims arising from the pleadings need not be tried because they are not in dispute.' [Citation.] 'The function of the pleadings in a motion for summary judgment [adjudication] is to delimit the scope of the issues: the function of the affidavits or declarations is to disclose whether there is any triable issue of fact within the issues delimited by the pleadings.' [Citations.]" (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381 [282 Cal.Rptr. 508]; see *Leibert v. Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693, 1699 [39 Cal.Rptr.2d 65].) A plaintiff may not avoid a summary judgment by producing evidence to support claims outside the issues framed by the pleadings. (*City of Hope Nat. Medical Center v. Superior Court* (1992) 8 Cal.App.4th 633, 639 [10 Cal.Rptr.2d 465].)

## II.

### Westfield's Rules

Westfield has adopted rules for public use of the common areas of the Galleria (the Rules). In this part we will simply summarize the relevant portions of the Rules while leaving detailed discussion of the meaning of the Rules to a subsequent part.[3]

The Rules start with an introduction that notes the private ownership status of the mall; they expressly disclaim that any enforcement of the Rules or activity pursuant to the Rules "shall constitute or be deemed to constitute a dedication of the [mall] to public uses. The Rules do not constitute an acquiescence or a waiver of the private property rights of the owners of the [mall]."

The introduction to the Rules then states, "[t]hese Rules are not intended to apply to activity sponsored by the [mall] and/or an enterprise(s) engaged in

---

[3] Although we describe various provisions of the Rules to provide an overview of Westfield's regulation of activities in the common areas of the mall, we limit our review and conclusions to the matters pled in Snatchko's first amended complaint. (*FPI Development, Inc. v. Nakashima, supra,* 231 Cal.App.3d at p. 381; *Leibert v. Transworld Systems, Inc., supra,* 32 Cal.App.4th at p. 1699.) Specifically, we address the Rules as they regulate peaceful, consensual noncommercial speech that is unaccompanied by any solicitation or use of written materials and that does not contain speech unprotected by the constitutional right to free speech. (See *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 245 [152 L.Ed.2d 403, 418, 122 S.Ct. 1389] [acknowledging "freedom of speech has its limits"]; *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134 [87 Cal.Rptr.2d 132, 980 P.2d 846] ["Although stated in broad terms, the right to free speech is not absolute."]; *Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1164 [72 Cal.Rptr.3d 231] [providing examples of unprotected classes of speech].)

business at the [mall]." "These Rules also are not intended to apply to private conversations between and among persons previously acquainted with one another."

With these exceptions, "[e]very individual, organization or entity desiring to use the [mall] common areas other than to patronize an enterprise(s) engaged in business at the [mall], must apply to the [mall] Security Office for permission to use [the mall] property." (Rules, § III.A.) Specifically, "[a]ll persons seeking to use the [mall] common areas for non-commercial expressive activity; other than activity sponsored by the [mall] and/or an enterprise engaged in business at the [mall], must submit an application, a copy of which is attached hereto." (Rules, Introduction.)[4]

"Any non-commercial expressive activity *not sponsored* by the [mall] and/or an enterprise(s) engaged in business at the [mall], *nor specifically permitted* under these Rules, *is expressly prohibited* on the [mall] property." (Rules, Introduction, italics added.)

So what activity is permitted under the Rules?

The Rules define "Approved Activity" as follows: " 'Approved Activity' is *Permissible Activity . . . that is approved pursuant to a properly submitted application . . . .* [¶] Activities which will not be approved include: [¶] 1. Performances; [¶] 2. Demonstrations; [¶] 3. Solicitation and/or acceptance of money; [¶] 4. Sales of products or services; [¶] 5. Distribution of samples of products; [¶] 6. Surveys which request more information than the person's name, address and telephone number; and [¶] 7. Invitations, passes or coupons giving the recipient anything that is otherwise available to be purchased." (Rules, § II.C, original underscoring, italics added.)

"Permissible Activity" is in turn defined as "Non-Commercial Expressive Activity that is anticipated to result in individual or one-on-one communications as opposed to communications intended for a group of people simultaneously." (Rules, § II.B.)

The Rules define "Non-Commercial Expressive Activity" as "expressive activity that has a political, religious or other non-commercial purpose, such as the request for signatures on petitions, the registration of voters and the

---

[4] The introduction acknowledges some of the Rules may not be enforceable with respect to certain qualified labor activities and provides special treatment for those requesting access to the mall for such labor activities. As this case does not involve any labor activities, we omit the provisions relating to such activities from our summarization of the Rules and do not consider their effect, if any, on the issues raised on appeal.

dissemination of noncommercial leaflets or flyers. Non-Commercial Expressive Activity includes the display of an article of clothing or adornment, which is used to communicate: (1) by a person in the Common Areas of the [mall] for a purpose other than to patronize an enterprise(s) engaged in business at the [mall] or to engage in activities sponsored by the Center; or (2) by a person in the Common Areas of the Center who is approaching patrons with whom he or she was not previously acquainted for the purpose of communicating with them on a topic unrelated to the business interests of the [mall] and/or an enterprise(s) engaged in business at the [mall]." (Rules, § II.A.)

The Rules require applications for permission to engage in noncommercial expressive activity to be submitted to the mall's security office four days in advance of the proposed noncommercial expressive activity.[5] (Rules, § III.A.) Mall management will review the application to determine if the proposed activity is permissible.[6] (Rules, § III.E.) If the activity is permissible, the applicant will be assigned on a "first-come, first-selected" basis an approximately 64-square-foot space in one of three specifically identified designated areas within the mall.[7] (Rules, §§ II.G, III.E, VI.) "Permissible Activity may be conducted only in the assigned Designated Area . . . Permissible Activities are not allowed at any other location, including driveways and parking lots." (Rules, § VI.)

---

[5] Applications must have attached copies of any items intended to be used in the noncommercial expressive activity, including but not limited to audiovisual materials, petitions, literature, leaflets, voter registration materials, signs and displays. (Rules, § III.B.) The Rules include provisions regulating the size and display of signs, posters, placards, displays and written materials. (Rules, § XII.) Such materials "may not interfere with the commercial purpose of the [mall] or its tenants, or contain or depict 'fighting words,' obscenities, pornography, grisly or gruesome displays, highly inflammatory slogans likely to provoke a disturbance, or racial, religious or ethnic slurs." (Rules, § XII.B.) The Rules also require applications to be accompanied by or conditioned on various deposits, indemnity agreements, and insurance as may be applicable in specific situations. (Rules, §§ IV, V.) The application form requires the applicant to identify the subject matter or topic of each proposed activity. (Application, § B.)

[6] Westfield has adopted written internal policies and guidelines (Guidelines) to assist management in the administration of the Rules. The Guidelines state that a proposed activity may not be prohibited simply because its subject matter is unpopular.

[7] The applicant is limited to three consecutive days of use of the assigned designated area per application, may receive approval for no more than six days of use in any single calendar month and no more than 15 days in a year. (Rules, § III.C.) Applications will not be approved for specified peak-traffic days. (Rules, § X.)

## III.

### Westfield's Rules Violate California's Constitutional Right to Free Speech

■ Article I, section 2 of the California Constitution (hereafter article I, section 2) provides, in pertinent part, that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." (Art. I, § 2, subd. (a).) This provision is "broader and more protective than the free speech clause of the First Amendment." (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 366 [93 Cal.Rptr.2d 1, 993 P.2d 334] (*Alliance*).)

In the landmark case of *Pruneyard, supra*, 23 Cal.3d 899, the California Supreme Court concluded article I, section 2 protects the right of free speech, reasonably exercised, in a privately owned shopping mall, even though the First Amendment to the federal Constitution does not guarantee that right.[8] (*Pruneyard, supra*, at p. 910.) The California Supreme Court reaffirmed this holding in *Fashion Valley, supra*, 42 Cal.4th at pages 869–870.

The California Supreme Court has recognized this right of free speech does not mean "those who wish to disseminate ideas have free rein." (*Pruneyard, supra*, 23 Cal.3d at p. 910.) Free speech activity may be subject to reasonable regulations that "prohibit conduct 'calculated to disrupt normal business operations' or that would result in 'obstruction of or undue interference with normal business operations.' " (*Fashion Valley, supra*, 42 Cal.4th at p. 864, quoting *Diamond v. Bland* (1970) 3 Cal.3d 653, 665–666 [91 Cal.Rptr. 501, 477 P.2d 733]; accord, *Pruneyard, supra*, at pp. 910–911.)

■ The level of scrutiny that we apply to determine whether regulations adopted by a shopping mall are "reasonable," "depends upon whether [the rule] is a content-neutral regulation of the time, place, or manner of speech or restricts speech based upon its content. A content-neutral regulation of the time, place, or manner of speech is subjected to intermediate scrutiny to determine if it is '(i) narrowly tailored, (ii) serves a significant government interest, and (iii) leaves open ample alternative avenues of communication. [Citation.]' [Citation.] A content-based restriction is subjected to strict scrutiny." (*Fashion Valley, supra*, 42 Cal.4th at p. 865; accord, *International Society for Krishna Consciousness of California, Inc. v. City of Los Angeles* (2010) 48 Cal.4th 446 [106 Cal.Rptr.3d 834, 227 P.3d 395].) To survive strict scrutiny, "a content-based rule limiting expression in a shopping center that

---

[8] There is no dispute in this case that the Galleria qualifies as a public forum shopping mall coming within the scope of the *Pruneyard* decision.

constitutes a public forum must be necessary to serve a compelling interest and be narrowly drawn to achieve that end." (*Fashion Valley, supra,* 42 Cal.4th at p. 869.)

Thus, the first question we address is whether Westfield's Rules are content-neutral or content-based. We may consider federal First Amendment as well as California jurisprudence to analyze this question. (See *Pruneyard, supra,* 23 Cal.3d at p. 908; *Glendale Associates, Ltd. v. National Labor Relations Bd.* (9th Cir. 2003) 347 F.3d 1145, 1155 (*Glendale*).)

## A. *Westfield's Rules Are Content-based Regulations of Speech*

"Deciding whether a particular regulation is content based or content neutral is not always a simple task." (*Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 642 [129 L.Ed.2d 497, 517, 114 S.Ct. 2445] (*Turner Broadcasting*).) Literal or absolute content neutrality is not required. (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 877 [4 Cal.Rptr.3d 69, 75 P.3d 1] (*DVD Copy*); *Alliance, supra,* 22 Cal.4th 352, 368.) Rather, "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d 661, 675, 109 S.Ct. 2746] (*Ward*); see *DVD Copy, supra,* 31 Cal.4th at p. 877.) Government regulation of expressive activity is content neutral so long as it is " '*justified* without reference to the content of the regulated speech.' " (*Ward, supra,* at p. 791 [105 L.Ed.2d at p. 675], italics added.)

"But while a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases. [Citation.] Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content. [Citations.]" (*Turner Broadcasting, supra,* 512 U.S. at pp. 642–643 [129 L.Ed.2d at p. 518].) Specific illicit intent or motive is not the sine qua non of a violation of free speech. (*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.* (1991) 502 U.S. 105, 117 [116 L.Ed.2d 476, 487–488, 112 S.Ct. 501]; *Cincinnati v. Discovery Network, Inc.* (1993) 507 U.S. 410, 429 [123 L.Ed.2d 99, 116, 113 S.Ct. 1505] (*Cincinnati*).)

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech . . . are content based. [Citations.] By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." (*Turner*

*Broadcasting, supra,* 512 U.S. at p. 643 [129 L.Ed.2d at p. 518]; see *Fashion Valley, supra,* 42 Cal.4th at p. 866; *DVD Copy, supra,* 31 Cal.4th at p. 877; *Krontz v. City of San Diego* (2006) 136 Cal.App.4th 1126, 1136–1137 [39 Cal.Rptr.3d 535].) Regulation may not be " 'based on hostility—or favoritism—towards the underlying message expressed.' " (*Turner Broadcasting, supra,* at p. 642 [129 L.Ed.2d at p. 518], quoting *R. A. V. v. St. Paul* (1992) 505 U.S. 377, 386 [120 L.Ed.2d 305, 320, 112 S.Ct. 2538].) "[C]ourts consider a rule content-based when it establishes a general ban on speech, but maintains exceptions for speech on certain subjects." (*Glendale, supra,* 347 F.3d at p. 1155; see *Desert Outdoor Advertising, Inc. v. City of Moreno Valley* (9th Cir. 1996) 103 F.3d 814, 820.) Regulations based on " '[l]isteners' reaction to speech [are] not . . . content-neutral . . . .' " (*Fashion Valley, supra,* at p. 868.)

Snatchko contends Westfield's Rules are content based because they draw a facial distinction between commercial speech and noncommercial speech, favoring the former over the latter. Westfield[9] contends its Rules do not favor commercial speech over noncommercial speech. Westfield points out that the Rules *prohibit* commercial expressive activities (such as sales of products, advertising, distribution of coupons on the mall's property or other marketing activities) and *permit* noncommercial expressive activities subject only to the requirement that speakers submit a timely application and limit their activities to the assigned designated area. Largely failing to address whether the Rules are content based because of the different treatment of commercial and noncommercial speech (regardless of which is prohibited and which is allowed), Westfield emphasizes that it grants access to the designated areas for noncommercial expressive activity on a nondiscriminatory first-come, first-selected basis.

There is some authority for Snatchko's claim that regulations that draw a distinction between commercial and noncommercial speech are content based. (*Cincinnati, supra,* 507 U.S. at pp. 428–429 [123 L.Ed.2d at pp. 115–116]; *United Brotherhood of Carpenters & Joiners of America Local 586 v. National Labor Relations Bd.* (2008) 540 F.3d 957, 965 (*United Brotherhood*) [applying California law]; *Burbridge v. Sampson* (C.D.Cal. 1999) 74 F.Supp.2d 940, 947, 949 [resolving the issue based on the Cal. Const.].) It is not necessary, however, to decide whether such distinction alone makes Westfield's Rules content based.

■ Construing the language of the Rules together as a whole and giving a commonsense meaning to the language, the Rules go beyond simply distinguishing commercial from noncommercial speech. We conclude

---

[9] PSC joins in Westfield's arguments and supplies some "additional points and legal discussion."

the Rules allow conversation between strangers on matters related to the Galleria, its tenants and/or the noncommercial activities sponsored by the mall or its tenants while prohibiting peaceful, consensual, spontaneous conversations between strangers in common areas of the mall on topics unrelated to the activities of the mall, its tenants, or the noncommercial sponsored activities of the mall or its tenants.[10] This distinction makes the Rules content based. We explain.

The Rules state that they "are not intended to apply to *activity sponsored by the [mall] and/or enterprise(s) engaged in business at the [mall].*" (Rules, Introduction, italics added.) "These Rules also are not intended to apply to private conversations between and among persons previously acquainted with one another." (*Ibid.*)

With these exceptions, "[e]very individual, organization or entity desiring to use the [mall] common areas *other than to patronize an enterprise(s) engaged in business at the [mall]*, must apply to the [mall] Security Office for permission to use [the mall] property." (Rules, § III.A, italics added.) Specifically, "[a]ll persons seeking to use the [mall] common areas for noncommercial expressive activity; *other than activity sponsored by the [mall] and/or an enterprise engaged in business at the [mall]*, must submit an application, a copy of which is attached hereto." (Rules, Introduction, italics added.)

"Any non-commercial expressive activity *not sponsored by the [mall] and/or an enterprise(s) engaged in business at the [mall]*, nor specifically permitted under these Rules, is expressly prohibited on the [mall] property." (Rules, Introduction, italics added.)

These provisions make it clear that the Rules do not apply to the mall or its merchant tenants. The mall and its tenants may engage in both commercial activity and sponsor noncommercial expressive activity with no requirement that they or the provider of their sponsored noncommercial activity submit an application for permission under the Rules. These provisions also make it clear that persons not associated with the mall or its tenants, but who are using the common areas of the mall in order to patronize the mall and/or its merchant tenants are not subject to the Rules.

---

[10] We requested and received supplemental briefing from the parties addressing the following two questions: (1) Do Westfield's " 'Rules For Public Use Of Common Areas At Westfield Shoppingtown Galleria At Roseville' . . . allow conversation between strangers on matters related to the Galleria, its tenants and/or activities sponsored by the Galleria or its tenants while prohibiting or restricting conversation between strangers on matters unrelated to the Galleria, its tenants and/or activities sponsored by the Galleria or its tenants? (2) If so, does this make the Rules content-based and therefore subject to strict scrutiny?"

That persons using the common areas of the mall for the purpose of patronizing a business in the mall or participating in a noncommercial expressive activity sponsored by the mall or its tenants may converse with other people at the mall about such purposes is necessarily implied. To construe the Rules otherwise, i.e., to conclude the Rules require a person to file an application four days in advance before engaging another mall patron (with whom they do not have a previous acquaintance)[11] in conversation about the businesses or sponsored activities of the mall, which themselves are not subject to the Rules, would be unreasonable. The reasonable interpretation of the Rules allows conversation between strangers on matters related to the Galleria, its tenants and/or the noncommercial activities sponsored by the mall or its tenants. The Rules prohibit or restrict conversation between strangers unrelated to such matters.

The definition of noncommercial expressive activity in the Rules further supports this understanding of the Rules. "Non-Commercial Expressive Activity" is "expressive activity that has a political, religious or other noncommercial purpose, such as the request for signatures on petitions, the registration of voters and the dissemination of noncommercial leaflets or flyers. Non-Commercial Expressive Activity includes the display of an article of clothing or adornment, which is *used to communicate*: (1) by a person in the Common Areas of the [mall] *for a purpose other than to patronize an enterprise(s) engaged in business at the [mall] or to engage in activities sponsored by the Center*; or (2) by a person in the Common Areas of the Center *who is approaching patrons with whom he or she was not previously acquainted for the purpose of communicating with them on a topic unrelated to the business interests of the [mall] and/or an enterprise(s) engaged in business at the [mall]*." (Rules, § II.A, italics added.) The italicized portions of this definition, thus, further clarify the inapplicability of the Rules to expressive activity related to the mall, its tenants and/or the noncommercial expressive activities sponsored by the mall or its tenants.

Finally, we find additional reinforcement of our construction of the Rules in the deposition testimony of Gavin Farnam, the senior general manager of the Galleria, which was submitted by Snatchko in opposition to Westfield's motion for summary adjudication.

Farnam testified at his deposition regarding his understanding of the meaning of the phrase "noncommercial expressive activity" as used in

---

[11] We give the example of a person talking to another person because the Rules, if they applied, would prohibit conversation altogether between more than two unacquainted persons. The Rules provide that an application will not be approved for proposed conversation between more than two persons. (Rules, § II.B ["permissible activity" is noncommercial expressive activity "that is anticipated to result in individual or one-on-one communications"].)

Westfield's Guidelines to mean "a person or group going up to people that they don't know, *talking about a subject unrelated to the mall* for something that meets their own objective or agenda." (Italics added.) Questioned as to how a decision is made whether a person is violating the Guidelines/Rules regarding noncommercial expressive activity Farnam said that, "[i]f the person is going up approaching multiple people, talking to a bunch of different people that he doesn't know, passing out business cards, doing those sorts of things, that becomes the issue. [¶] If they're talking about multiple people going up *talking about topics unrelated to the center*." (Italics added.) At another point, Farnam repeated: "It's about if that person or group is going up to multiple people that they don't know, *talking about a topic unrelated to the mall* and for their own objective, that's what it is. That's how we decipher it." (Italics added.)

Plaintiff's counsel and Farnam then had the following exchange:

"Q. [Plaintiff's counsel]: It doesn't matter what the content of the speech is, unless they're going up to people and talking to them about a store in the mall, or their shopping experience at Westfield or something that has some commercial relevance to the activities of the Westfield Mall, right?

"A. [Farnam]: Yes.

"Q. [Plaintiff's counsel]: So if you're going to be talking about activities related to Westfield Mall, you're free to go up to strangers and speak to them, right?

"A. [Farnam]: If you've—if you've—yes.

"Q. [Plaintiff's counsel]: But if you're going to talk about any other subject other than activities related to the Westfield Mall, then you're prohibited from going up to—up to strangers and speaking to them; is that correct?

"[Westfield's counsel]: I object. That misstates his testimony.

"Q. [Plaintiff's counsel]: Is that correct?

"A. [Farnam]: That's not correct. It doesn't prohibit you. It just means you have to come in and fill out the application for third party access for noncommercial use.

"Q. [Plaintiff's counsel]: So the fact that I'm talking to strangers about a subject unrelated to the commercial activities of the mall means that I have to fill out an application to get permission to do that at Westfield; is that right? [¶] . . . [¶]

"[Farnam]: [Y]es.

"Q. [Plaintiff's counsel]: So if I'm at the mall and I'm excited about the Super Bowl coming up and I want people to know that I'm a Patriots fan or a Giants fan, I don't have a right at the Westfield Galleria to go up and tell people, 'Hey, hope you're supporting the Patriots,' or, 'Hope you're supporting the Giants this week,' if I don't know that person because that speech has nothing to do with the commercial activities of the mall, is that right?

"A. [Farnam]: You can go in and again fill out a third party access if that's what a person chooses to do."

Plaintiff's counsel subsequently reiterated: "And, again, even if somebody goes up to numerous strangers, as long as they're talking about a subject matter that's related to the commercial interests of the mall, that's not prohibited by the Courtesy Guidelines, correct?" Farnam answered, "Correct." Asked if it was his testimony "that if I'm sitting on the bench waiting for people to come sit next to me so I can talk to them about subjects unrelated to the commercial interests of the mall, that I'm engaged in prohibited expressive activity," Farnam responded, "If they're engaging the person, yes."

While not determinative of the meaning of the Rules, the understanding of Farnam, the person in charge of administering the Rules at the Galleria, is entitled to some consideration and in this case is aligned with our construction of the Rules.

We, therefore, reject Westfield's claim, in its supplemental brief, that the Rules do not distinguish between speech related and unrelated to the Galleria, its tenants or their sponsored activities. The Rules allow conversation between strangers on matters *related to* the Galleria, its tenants and/or the noncommercial activities sponsored by the mall or its tenants. Yet the Rules prohibit or restrict (depending on whether it is anticipated that the conversation will be one-on-one or not) noncommercial speech between strangers on matters *unrelated to* the Galleria, its tenants or their sponsored activities. The Rules prohibit spontaneous conversation between strangers on topics unrelated to the mall, its tenants or their sponsored activities. We conclude this topic-based distinction makes the Rules content based and subject to strict scrutiny. "Restrictions upon speech ' "that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." [Citation.]' [Citation.]" (*Fashion Valley, supra*, 42 Cal.4th at p. 866.)

Given such initial content-based distinction, it is immaterial that the Rules do not further discriminate between topics of noncommercial speech unrelated to the mall or otherwise provide for approval of applications on

a first-come, first-selected basis. We find the following comment by the California Supreme Court analogous: "The Mall's rule prohibiting all boycotts may be *viewpoint neutral*, because it treats all requests for a boycott the same way, but it is not *content neutral*, because it prohibits speech that urges a boycott while permitting speech that does not." (*Fashion Valley, supra,* 42 Cal.4th at p. 866, fn. omitted.) Here, the Rules treat all applications for noncommercial expressive activity the same way, but the Rules are not content neutral because they prohibit or restrict speech unrelated to the mall's interests while permitting speech that is related to the mall's interest. The Rules are content based.

## B. *Westfield's Rules Fail to Survive Strict Scrutiny*

■ "Content-based restrictions are presumptively unconstitutional . . . ." (*United Brotherhood, supra,* 540 F.3d at pp. 964–965; see *Glendale, supra,* 347 F.3d at p. 1156.) As we have noted, to survive strict scrutiny, a shopping mall's "content-based rule . . . must be necessary to serve a compelling interest and be narrowly drawn to achieve that end." (*Fashion Valley, supra,* 42 Cal.4th at p. 869.)

Westfield contends it has a compelling interest "in protecting itself and its tenants from commercial use of the mall's common areas by third parties who do not pay Westfield rent for the use of any part of the mall." This claim is nonresponsive to the application of the Rules to the noncommercial activity of Snatchko described in his first amended complaint, which was the subject of Westfield's motion for summary adjudication. Although we have generally described the effect of the Rules on both commercial and noncommercial speech as relevant to our determination of whether the Rules are content based, the issues before us are limited to the matters pled. We are concerned with what interest is served by Westfield's Rules prohibiting or restricting peaceful, consensual noncommercial conversation between strangers on matters unrelated to the interests of the mall, its tenants or their sponsored activities, like that of Snatchko.

In asserting that its Rules serve a significant interest, Westfield claims the application process restricting noncommercial expressive activities serves three significant interests. First, Westfield alleges the Rules promote safety through the avoidance of fire code violations and the disruption and congestion that could result from unregulated expressive activities. In support, Westfield cites us to portions of the deposition testimony of Sarah Vasquez, a senior vice-president and manager for Westfield, in which Vasquez states the Rules "are necessary to avoid disruption to normal business operations [and] prevent congestions by effectively managing pedestrian traffic within the shopping center's common areas." "The use of the designated areas also

allows the Galleria to comply with local regulations, including fire and safety regulations, which may restrict the number of persons who can be in a particular location or restrict persons from certain doors or exits to ensure ingress and egress."

These important safety concerns support the adoption of reasonable time, place and manner regulations. The California Supreme Court has recognized shopping malls may "prohibit *conduct* 'calculated to disrupt normal business operations' or that would result in 'obstruction of or undue interference with normal business operations.' " (*Fashion Valley, supra*, 42 Cal.4th at p. 864, italics added.) However, such safety concerns do not support content-based rules prohibiting or restricting only speech between strangers that is unrelated to the mall, its tenants or their sponsored activities. This is so because the Rules do allow unlimited numbers of previously acquainted individuals to congregate and converse in any location and unlimited numbers of strangers to congregate in any location and converse about topics related to the mall, its tenants or their sponsored activities. Westfield has not shown its content-based Rules are necessary to serve the interest of safety.

Second, Westfield argues the Rules promote the convenience of mall patrons. In her deposition testimony, Vasquez states the Rules "protect customer convenience and comfort by identifying those persons who are engaging in the noncommercial expressive activity, which allows a patron to avoid the activity or conversation if he or she chooses without any unnecessary frustration or inconvenience." Vasquez opines that, "the Galleria's common area is not conducive to allowing individuals and groups engaging in noncommercial expressive activity to 'roam' throughout the Galleria, approaching patrons to communicate their message." Such roaming "can lead to confrontations . . . which can be avoided if the activity is limited to a designated area. Specifically, a patron can either choose to avoid the discussion or approach the person in the designated area for more information or debate. Because, in my experience, customers often leave the shopping center rather than complain, it is imperative to allow customers the choice and ability to knowingly avoid noncommercial expressive activity with which they disagree or wish to avoid." According to Vasquez, "it is extremely critical to the operations of any shopping center, and the retail tenants in these centers, that customers are not unreasonably disturbed or otherwise dissatisfied with the shopping center or its retail establishments. To remain competitive, a shopping center must work to provide an enjoyable, stress-free shopping atmosphere for all customers." "[P]atrons do not like to be confronted by Unknown Individuals impressing their ideas or beliefs upon them or engaging in similar one-on-one noncommercial communication."

We accept the truth of Vasquez's comments for purposes of this case. Nevertheless, accepting the validity of Westfield's concerns, we find providing a "stress-free shopping atmosphere" for patrons is not a compelling interest compared to the free speech rights of other individuals at the mall.[12] Indeed, the California Supreme Court has already determined that a public forum shopping mall's business interest in ensuring its shopping customer's convenience and undisturbed comfort in order to prevent loss of customers and maximize profit is not a compelling interest justifying a content-based restriction of speech. In *Fashion Valley, supra*, 42 Cal.4th 850, the Supreme Court concluded a shopping mall's rule that prohibited speech advocating a boycott was content based and so subject to strict scrutiny. (*Id.* at p. 869.) The rule failed to withstand strict scrutiny as the mall's "purpose to maximize the profits of its merchants is not compelling compared to the Union's right to free expression." (*Ibid.*) If a shopping mall cannot prohibit speech advocating a boycott, which by its nature directly seeks to reduce patronage of one of the mall's merchants, we fail to see how a shopping mall can justify the prohibition or restriction of peaceful, noncommercial speech (here religious expression) because it might result in lost profits if shoppers become annoyed or offended and leave.

Again, we turn to the Supreme Court's opinion in *Fashion Valley, supra*, 42 Cal.4th 850. The shopping mall in *Fashion Valley* argued boycotts could be prohibited for the same reason solicitation of funds can be prohibited (*id.* at p. 867), relying heavily on *H-CHH Associates v. Citizens for Representative Government* (1987) 193 Cal.App.3d 1193, 1203 [238 Cal.Rptr. 841] (*H-CHH*), a case that upheld a shopping center's prohibition of solicitation of funds from patrons because it interfered with the normal character and function of the shopping mall (*Fashion Valley, supra*, at p. 868). The Supreme Court expressly rejected *H-CHH* to the extent it suggested speech may be prohibited if it interferes with the shopping mall's business by competing with the mall's merchants. (*Ibid.*) Similarly here, the prohibition or restriction of noncommercial speech unrelated to the mall cannot be justified simply because it might interfere with the merchandising interests of the mall and its tenants.[13]

---

[12] " '[I]f absolute assurance of tranquility is required, we may as well forget about free speech. Under such a requirement, the only "free" speech would consist of platitudes. That kind of speech does not need constitutional protection.' " (*Spence v. Washington* (1974) 418 U.S. 405, 416 [41 L.Ed.2d 842, 850, 94 S.Ct. 2727] (conc. opn. of Douglas, J.), quoting *State of Iowa v. Kool* (Iowa 1973) 212 N.W.2d 518, 521.) " '[T]he freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole.' " (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1147 [57 Cal.Rptr.3d 320, 156 P.3d 339].)

[13] We note the United States Supreme Court has "stated that offensiveness [is] 'classically not [a] [justification] validating the suppression of expression protected by the First Amendment. At least where obscenity is not involved, we have consistently held that the fact that

Nor does the case of *Union of Needletrades, etc. Employees v. Superior Court* (1997) 56 Cal.App.4th 996 [65 Cal.Rptr.2d 838] (*UNITE*) persuade us otherwise. In that case the court upheld regulations of several shopping malls, which defendants contend are substantially the same as Westfield's Rules. The union in *UNITE* sought access to six malls to picket and distribute leaflets in an effort to publicize its labor dispute with a particular store. (*UNITE*, at p. 1001.) The union was denied access to the malls because it failed to submit completed applications for access to five of the six malls and refused an offered alternate location for its activity upon application to the sixth mall. (*Ibid.*) The union filed suit alleging the malls adopted and enforced " 'unreasonable and burdensome rules and requirements regulating political expression.' " (*Ibid.*) The Court of Appeal upheld the malls' regulations limiting expressive activity to designated areas and specified times as content neutral, reasonable time, place and manner restrictions. (*Id.* at pp. 1009–1014.) When the union argued components of the rules regarding prior approval of signs, prior identification of participants, and interference with mall tenants were impermissible content-based regulation, the court either rejected the claim in reliance on the reasoning of *H-CHH* or found the union's arguments were not properly pled. (*Id.* at pp. 1014–1021.) Given the California Supreme Court's subsequent disapproval of the relied-upon reasoning of H-CHH (*Fashion Valley, supra*, 42 Cal.4th at p. 868), we question the continued authority of*UNITE* on these latter points. In any event, none of the regulations addressed by the court in *UNITE* are similarly at issue here. Rather, we are concerned with Westfield's prohibition or restriction of peaceful, consensual noncommercial conversation between strangers unless the conversation relates to the mall, its tenants or their sponsored activities.

Nor do we find *Costco Companies v. Gallant* (2002) 96 Cal.App.4th 740 [117 Cal.Rptr.2d 344] (*Costco Companies*), helpful to our consideration of this case. The court in *Costco Companies* upheld a store's content-neutral restriction of expressive activity at its stores, relying on the "interference with purpose" reasoning subsequently rejected by the Supreme Court in *Fashion Valley, supra*, 42 Cal.4th at page 868. (*Costco Companies, supra*, at pp. 749–754.) We are concerned here with a content-based rule subject to strict scrutiny.

■ Westfield claims that preventing it from enforcing its Rules would amount to an unconstitutional "taking" under the Fifth Amendment of the United States Constitution. Westfield primarily relies on *Pruneyard Shopping Center v. Robins, supra*, 447 U.S. 74 [64 L.Ed.2d 741]. Actually, the United States Supreme Court concluded in *Pruneyard* that permitting the exercise of state-protected rights of free expression and petition on shopping center

protected speech may be offensive to some does not justify its suppression.' " (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 71 [77 L.Ed.2d 469, 480, 103 S.Ct. 2875].)

property "clearly does not amount to an unconstitutional infringement of the appellants' property rights under the Taking Clause" since there was nothing "to suggest that preventing appellants from prohibiting this sort of activity will unreasonably impair the value or use of their property as a shopping center and the shopping mall could "restrict expressive activity by adopting time, place, and manner regulations that will minimize any interference with its commercial functions." (*Id.* at p. 83 [64 L.Ed.2d at p. 753].) The United States Supreme Court stated the "appellants have failed to demonstrate that the 'right to exclude others' is so essential to the use or economic value of their property that the state-authorized limitation of it amounted to a 'taking.' " (*Id.* at p. 84 [64 L.Ed.2d at p. 754].)

We similarly conclude here that Westfield has not shown that preventing it from enforcing its content-based Rules will "unreasonably" impair the value or use of its property or that the right to preclude strangers from peacefully, consensually talking about matters unrelated to the mall, its tenants or their sponsored activities is so essential to the use of economic value of its property that invalidating the application of the Rules to such activity amounts to a "taking." (*Pruneyard Shopping Center v. Robins, supra*, 447 U.S. at pp. 83–84 [64 L.Ed.2d at pp. 753–754].) Westfield may still adopt reasonable time, place, and manner regulations that are content neutral. (*Ibid.*) However, as we discuss *post*, Westfield's Rules currently go too far to be considered reasonable time, place, and manner regulations.

Lastly, Westfield contends it has a First Amendment interest in "remaining neutral on volatile political and social issues." We are not persuaded Westfield's Rules prohibiting or restricting peaceful, consensual conversations between strangers on matters unrelated to the mall, its tenants or their sponsored activities are necessary to serve this interest. The views expressed by persons present at the Galleria who engage in consensual conversation with other individuals at the mall, albeit strangers, are not likely to be identified with those of Westfield and Westfield can expressly disavow any connection with such views by simply posting signs to that effect. (See *Pruneyard Shopping Center v. Robins, supra*, 447 U.S. 74, 87 [64 L.Ed.2d 741, 756].) Westfield is not being compelled to espouse or respond to any particular message. (Cf. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 575 [132 L.Ed.2d 487, 504–505, 115 S.Ct. 2338]; *Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 15–16 [89 L.Ed.2d 1, 11–13, 106 S.Ct. 903].)

Not only do we find no compelling interest requiring Westfield's Rules, we find they fail strict scrutiny on another ground as well. To survive strict scrutiny, a content-based regulation of noncommercial speech must "be narrowly tailored (that is, the least restrictive means)" to promote the

compelling interest. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 952 [119 Cal.Rptr.2d 296, 45 P.3d 243]; see *Fashion Valley, supra*, 42 Cal.4th at p. 869.) The prohibition or restriction of all noncommercial speech between strangers on matters unrelated to the mall, its tenants or their sponsored activities is plainly not the least restrictive means of meeting the interests Westfield has identified.

## C. *Even If We Were to Find Westfield's Rules Content Neutral, the Rules Would Fail Intermediate Scrutiny*

"A content-neutral regulation of the time, place, or manner of speech is subjected to intermediate scrutiny to determine if it is '(i) narrowly tailored, (ii) serves a significant government interest, and (iii) leaves open ample alternative avenues of communication. [Citation.]' [Citation.]" (*Fashion Valley, supra*, 42 Cal.4th at p. 865; see *International Society for Krishna Consciousness of California, Inc. v. City of Los Angeles, supra*, 48 Cal.4th 446.)

"[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial . . . interest that would be achieved less effectively absent the regulation.' [Citations.]" (*Ward, supra*, 491 U.S. at p. 799 [105 L.Ed.2d at p. 680].) It need not be the least restrictive or least intrusive means of serving such interest, but "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." (*Id.* at pp. 798–799 [105 L.Ed.2d at pp. 680–681], fn. omitted; accord, *Savage v. Trammell Crow Co.* (1990) 223 Cal.App.3d 1562, 1574–1575 [273 Cal.Rptr. 302].)

Westfield's Rules burden substantially more speech than is necessary to further its legitimate safety and convenience interests. The Rules prohibit strangers from consensually engaging in peaceful spontaneous political or religious discussions even if they do not converse loudly, attract a crowd, block any ingress/egress to the mall, its tenants or their activities, distribute any literature, hold any signs or placards, request signatures for any petition, solicit any contributions, or compromise any fire or other safety precautions. In other words, the Rules prohibit unplanned classic pure free speech between strangers who mutually agree to converse and who cause no disturbance of the peace or otherwise burden, interfere with, or impose additional risk on the operation or enjoyment of the mall.

Moreover, by prohibiting or restricting all speech between strangers on topics that are not related to the activities of the mall, its tenants or their

sponsored activities, the Rules not only prohibit strangers from consensually engaging in peaceful political or religious discussions as we have described, they also prohibit even casual conversation between teenagers who go to the mall to meet, socialize, and talk with other teenagers. Spur-of-the-moment conversations between strangers who go to the mall to exercise in the common areas are banned. The Rules forbid strangers to converse in order to while away the time as their spouses shop. Under the language of the Rules, strangers could not choose to engage in impromptu chitchat while they stand in a checkout line in a common area.

We reject Westfield's claim in its supplemental brief that the Rules do not prohibit such "small talk" because such speech is "non-expressive" and therefore, not governed by the Rules.

In support of the proposition that the Rules can reasonably be understood to exempt "casual" conversation from its regulations as nonexpressive speech, Westfield cites *Hill v. Colorado* (2000) 530 U.S. 703 [147 L.Ed.2d 597, 120 S.Ct. 2480] (*Hill*). In *Hill*, the United States Supreme Court concluded social, random or other everyday communications—"casual conversation"—would not fall within the terms of the challenged Colorado statute, which made it unlawful for any person within 100 feet of a health care facility entrance to knowingly approach within eight feet of another person without that person's consent, to among other things, engage in " 'oral protest, education, or counseling' " with such other person. (*Id.* at pp. 707, 720–722 [147 L.Ed.2d at pp. 606, 614–615].) *Hill* did not say casual conversation was nonexpressive speech, only that it was not " 'oral protest, education, or counseling.' " (*Id.* at pp. 721–722 [147 L.Ed.2d at pp. 614–615].)

In support of Westfield's claim that "small talk" is "non-expressive speech," it cites two other cases dealing with speech in the context of the First Amendment right to freedom of assembly. (*Christian Legal Society v. Walker* (7th Cir. 2006) 453 F.3d 853; *Wine & Spirits v. Rhode Island* (1st Cir. 2005) 418 F.3d 36.) These cases have no application here and nowhere discuss "non-expressive speech."

Indeed, while we are aware of cases discussing the regulation of nonexpressive *elements of* speech (e.g., *United States v. O'Brien* (1968) 391 U.S. 367, 376–377 [20 L.Ed.2d 672, 679–680, 88 S.Ct. 1673]) or nonexpressive *conduct* (e.g., *James v. City of Long Beach* (C.D.Cal. 1998) 18 F.Supp.2d 1078, 1082–1083), we have been cited to, and our independent research has found, no case identifying the existence of such a thing as nonexpressive speech. Such term appears to be something of an oxymoron—speech by definition is expressive. (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1199, col. 1 [speech is "the communication or *expression* of thoughts in spoken words," italics added].)

Westfield's Rules cannot be reasonably interpreted to exempt small talk or casual conversation from their scope.

Viewing the scope of the Rules as a whole, we conclude the Rules are not narrowly tailored even for the purpose of intermediate review.

### D.  *Westfield's Rules Are Overbroad*

Snatchko contends the Rules are unconstitutionally overbroad. We agree.

A regulation is overbroad if it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the [regulation's] plainly legitimate sweep.' " (*Virginia v. Hicks* (2003) 539 U.S. 113, 118–119 [156 L.Ed.2d 148, 157, 123 S.Ct. 2191].) "A [regulation] may be invalidated on its face, however, only if the overbreadth is 'substantial.' [Citations.] The requirement that the overbreadth be substantial arose from our recognition that application of the overbreadth doctrine is, 'manifestly, strong medicine,' [citation], and that 'there must be a realistic danger that the [regulation] itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.' [Citation.]" (*Airport Comm'rs v. Jews for Jesus, Inc.* (1987) 482 U.S. 569, 574 [96 L.Ed.2d 500, 507, 107 S.Ct. 2568].)

In its original argument, before it submitted its supplemental brief arguing that the Rules do not cover nonexpressive speech, Westfield contended that once conversations between previously acquainted persons are eliminated, the Rules "impact on 'casual conversations, friendly chatter, or small talk' is utterly *de minimis*, and in no event 'substantial' relative to the scope of the regulation's plainly legitimate applications. Significantly, [Snatchko] points to not a single incident in which the mall's rules were applied to restrict 'casual conversations, friendly chatter, or small talk.' As a practical matter, no shopping mall owner is going to waste the time of its employees in an attempt to preclude such interaction amongst mall patrons."

We are unpersuaded by Westfield's argument minimizing the facial breadth of the Rules. Westfield's explanation that it would be a waste of time to preclude such interaction amongst mall patrons relates to Westfield's enforcement of the Rules, a matter we consider in evaluating their vagueness, *post.*

Considering the facial breadth of the Rules, we conclude the Rules do prohibit a substantial amount of protected speech even though they except conversations between previously acquainted individuals. In prohibiting all spur-of-the-moment conversation between strangers on topics unrelated to the mall, its tenants or their sponsored activities, the Rules preclude strangers from talking about everything from their political, social, environmental or religious views to their views on current sports events (see the testimony of Farnam, quoted *ante*) or even the weather. Given the wide variety of reasons

people go to shopping malls and the range of possible conversations between individuals at the mall, Westfield's prohibition of strangers spontaneously talking to each other on topics unrelated to the mall substantially burdens far more protected speech than is necessary to meet Westfield's safety and convenience concerns.

### E.  *Westfield's Rules Are Vague*

In a related and overlapping claim, Snatchko argues Westfield's Rules are unconstitutionally vague.[14] Again, we agree.

A law is unconstitutionally vague if it fails to meet two basic requirements: (1) The regulations must be sufficiently definite to provide fair notice of the conduct proscribed; and (2) the regulations must provide sufficiently definite standards of application to prevent arbitrary and discriminatory enforcement. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1106–1107 [40 Cal.Rptr.2d 402, 892 P.2d 1145] (*Tobe*); *State Bd. of Equalization v. Wirick* (2001) 93 Cal.App.4th 411, 419 [112 Cal.Rptr.2d 919] (*Wirick*).)

"A vague law is offensive for several reasons. 'First, the person of ordinary intelligence should have a reasonable opportunity to know what is prohibited. A vague law may trap the innocent by not providing fair warning. Second, a vague law impermissibly delegates the legislative job of defining what is prohibited to policemen, judges, and juries, creating a danger of arbitrary and discriminatory application. Third, a vague law may have a chilling effect, causing people to steer a wider course than necessary in order to avoid the strictures of the law.' [Citation.]" (*Wirick, supra*, 93 Cal.App.4th at pp. 419–420.)

"Only a reasonable degree of certainty is required, however." (*Tobe, supra*, 9 Cal.4th at p. 1107.) If a reasonable and practical construction can be given, the law will not be held void for uncertainty. (*Wirick, supra*, 93 Cal.App.4th at p. 420.)

As noted before, Westfield contends "[a]s a practical matter, no shopping mall owner is going to waste the time of its employees in an attempt to preclude [casual conversations, friendly chatter, or small talk] amongst mall patrons." We do not doubt this is true. However, the Rules provide no standards or guidelines for determining whether a particular conversation is "casual" or "friendly chatter" or merely "small talk." Both patrons of the mall and security personnel are left to guess what particular conversation topics will cross the line onto prohibited grounds. It may be easy to say weather

---

[14] "Although, . . . '[t]he concepts of vagueness and overbreadth are related,' there are important differences." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115 [60 Cal.Rptr.2d 277, 929 P.2d 596] (*Acuna*).)

topics are allowed, but what about sports topics? They can evoke strong team/player like or dislike and animated discussion with one side trying to persuade the other side of the merit of its views. Are those conversations prohibited? Westfield's general manager, Farnam, believed they were. Are only topics generally considered sensitive or volatile—typically politics and religion—prohibited? But is a conversation, for example, regarding the vote of a city council on a proposal for a new sports complex for a local professional team a conversation about politics or sports? Is a conversation about getting prepared for Hanukkah, Christmas or Easter necessarily a religious conversation? Can strangers ever peacefully and consensually engage in impromptu conversation regarding religion or politics without violating the Rules?

Significantly, even Westfield's counsel seem unable to describe the parameters of the Rules with any clarity, submitting arguments initially that appear to concede the Rules apply to casual conversations, but later contending the Rules are inapplicable to such conversations as nonexpressive speech. If Westfield itself cannot determine what the Rules cover, then the Rules must be " 'in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " (*Acuna, supra*, 14 Cal.4th at p. 1115; accord, *People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866 [106 Cal.Rptr.3d 560].) Without any standards, the Rules are ripe for arbitrary and discriminatory enforcement.

We conclude the Rules are unconstitutionally vague.

## IV.

### The Trial Court Erred in Striking Snatchko's Prayer for Attorney Fees

Snatchko's original complaint contained a prayer for attorney fees incurred in this litigation. PSC filed a motion to strike such prayer on the ground Snatchko had not adequately pled and could not plead a legal basis for such fees. The trial court granted the motion to strike the claim for attorney fees stating, "[i]nsufficient facts are stated for recovery of attorneys' fees per [Code of Civil Procedure section] 1021.5."

Snatchko claims the trial court erred in striking his prayer for attorney fees because he meets all the elements required for an award of fees under Code of Civil Procedure section 1021.5 (section 1021.5).[15] Snatchko also claims the trial court's decision was in error because the issue "was not ripe" under section 1021.5.

[15] Code of Civil Procedure section 1021.5 "is a codification of the private attorney general doctrine adopted by the California Supreme Court." (*County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 647 [52 Cal.Rptr.3d 1].) Section 1021.5

PSC responds that Snatchko has waived his right to challenge the trial court's grant of its motion to strike by failing to include a prayer for attorney fees in his first amended complaint, an action that PSC views as a voluntary withdrawal of the request for fees. PSC also disputes Snatchko's entitlement to attorney fees under Code of Civil Procedure section 1021.5.

"There is *no requirement that the intent to seek attorney fees under section 1021.5 must be pleaded in the underlying action.* [Citation.] Such fees are not part of the underlying cause of action, but are incidents to the cause and are properly awarded after entry of a . . . judgment . . . ." (*Washburn v. City of Berkeley* (1987) 195 Cal.App.3d 578, 583 [240 Cal.Rptr. 784], italics added.) As there was no requirement they be pled at all, the trial court erred in striking Snatchko's prayer for attorney fees based on a failure to adequately plead their basis, and Snatchko's failure to reallege his request for fees in his first amended complaint does not waive or forfeit his ability to seek them at the conclusion of this case.

We will not rule now on the merits of any such motion as the decision whether to award attorney fees under Code of Civil Procedure section 1021.5 rests with the trial court initially. (*Baggett v. Gates* (1982) 32 Cal.3d 128, 142 [185 Cal.Rptr. 232, 649 P.2d 874]; *County of Colusa v. California Wildlife Conservation Bd., supra,* 145 Cal.App.4th at p. 647.)

## DISPOSITION

The stipulated judgment resolving all causes of action in favor of defendants/respondents and against plaintiff/appellant is reversed. The trial court is directed to vacate its order granting summary adjudication of plaintiff/appellant's claims for intentional infliction of emotional distress, negligence, violation of his civil rights, injunctive, and declaratory relief and enter a new order denying defendant/respondent Westfield's motion. Costs on appeal are awarded to plaintiff/appellant. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

Robie, Acting P. J., and Butz, J., concurred.

A petition for a rehearing was denied September 3, 2010, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied October 20, 2010, S186415. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.

provides in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."