Filed 5/19/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MAE M. et al., | |
| Plaintiffs and Appellants, | G064332 |
| v. | (Super. Ct. No. CVSW2306224) |
| JOSEPH KOMROSKY et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from an order of the Superior Court of Riverside County, Eric A. Keen, Judge. Reversed in part and dismissed in part. Requests for judicial notice granted in part and denied in part.

Public Counsel, Mark Rosenbaum, Amanda Mangaser Savage, Mustafa Ishaq Filat, Yi Li, Amelia Piazza, Kathryn Eidmann; Ballard Spahr, Scott S. Humphreys, Elizabeth L. Schilken and Maxwell S. Mishkin for Plaintiffs and Appellants.

California Teachers Association, Laura P. Juran, Jean Shin; Rothner, Segall & Greenstone and Glenn Rothner for California Teachers Association, California Federation of Teachers, California Faculty Association, California School Employees Association, and Service Employees International Union California State Council as Amici Curiae on behalf of Plaintiffs and Appellants.

ACLU Foundation of Southern California, Amanda Goad, Christine Parker, Ariana Rodriguez; ACLU Foundation of Northern California, Elizabeth Gill and Jennifer Chou for ACLU of Southern California and ACLU of Northern California as Amici Curiae on behalf of Plaintiffs and Appellants.

Covington & Burling and Nitin Subhedar for LatinoJustice PRLDEF, California Immigrant Policy Center, and Asian Law Caucus as Amici Curiae on behalf of Plaintiffs and Appellants.

Penguin Random House, Carolyn Foley, Daniel R. Novack, Ojasvinee Singh, for Penguin Random House LLC; Jassy Vick Carolan and Jean-Paul Jassy for Penguin Random House LLC, The Authors Guild, The Freedom to Read Foundation, Freedom to Learn Advocates, American Booksellers for Free Expression, National Council of Teachers of English, and The PEN American Center, Inc., as Amici Curiae on behalf of Plaintiffs and Appellants.

Rob Bonta, Attorney General, Michael L. Newman, Assistant Attorney General, Laura L. Faer, James F. Zahradka II, Jonathan Benner, Alexander Simpson and Edward Nugent, Deputy Attorneys General for the State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Advocates for Faith & Freedom, Robert H. Tyler and Julianne E. Fleischer for Defendants and Respondents.

C. Erin Friday for Our Duty-USA as Amicus Curiae on behalf of Defendants and Respondents.

LiMandri & Jonna, Charles S. LiMandri, Paul M. Jonna and Jeffrey M. Trissell for Elizabeth Mirabelli and Lori Ann West as Amici Curiae on behalf of Defendants and Respondents.

Liberty Justice Center, Emily Rae; Atkinson, Adelson, Loya, Ruud & Romo, Anthony P. De Marco and Han-Hsien Miletic for Chino Valley Unified School District as Amicus Curiae on behalf of Defendants and Respondents.

California Justice Center and Julie A. Hamill for California Policy Center as Amicus Curiae on behalf of Defendants and Respondents.

Dhillon Law Group, Harmeet K. Dhillon, Karin M. Sweigart, Jesse D. Franklin-Murdock; Center for American Liberty, Mark Trammell, Josh Dixon and Eric A. Sell for Center for American Liberty as Amicus Curiae on behalf of Defendants and Respondents.

\* \* \*

The Temecula Valley Educators Association (the Association) and individual Temecula Valley Unified School District (the District) students, teachers, and parents (collectively, Plaintiffs) sued the District and five members of the District's school board (the Board) (collectively, Defendants), seeking declaratory and injunctive relief.

Plaintiffs seek to enjoin the Board's implementation of "Resolution No. 2022–23/21" (the Resolution), which prohibits District educators from using "Critical Race Theory or other similar frameworks . . . as a source to guide how topics related to race will be taught." The Resolution prohibits five enumerated elements of "Critical Race Theory" (CRT) and eight enumerated doctrines derived from CRT. The trial court denied Plaintiffs' motion for preliminary injunctive relief. Plaintiffs timely appealed the court's order.

To obtain a preliminary injunction, the trial court considers: "'(1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial

of interim injunctive relief.' [Citations.]" (*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 396 (*Tulare Lake*).)

As to the merits, Plaintiffs argue the Resolution is unconstitutionally vague on its face,[1] in that it is so ambiguous it fails to "provide fair notice of the conduct proscribed" and lacks "sufficiently definite standards of application," which leads to "arbitrary and discriminatory enforcement." (*Snatchko v. Westfield LLC* (2010) 187 Cal.App.4th 469, 495.) The trial court found Plaintiffs failed to present sufficient evidence showing probability of prevailing under the void-for-vagueness doctrine. We find the Resolution is unconstitutionally vague on its face because it employs ambiguous language, lacks definitions, is unclear in scope, is seemingly irreconcilable with state-mandated educational requirements, and contains no enforcement guidelines.

As for the balance of harms inquiry, the trial court must "compare[] the interim harm the plaintiff is likely to sustain if the injunction is denied to the harm the defendant is likely to suffer if the preliminary injunction is issued." (*Tulare Lake, supra,* 92 Cal.App.5th at p. 396.) Rather than consider both parties' relative harms, the court reiterated its finding that Plaintiffs did not show a likelihood of success on the merits by sufficiently alleging a constitutional violation. And because enjoining a government entity is a form of irreparable injury (*Maryland v. King* (2012) 567 U.S. 1301, 1303 (*Maryland*)), the court concluded, "[T]he balance of harms weighs in favor of denying the request for a preliminary injunction."

---

[1] Plaintiffs made three separate constitutional claims against the Resolution. We need only address their vagueness claim.

We find the trial court abused its discretion because its analysis was premised on the incorrect conclusion that the Resolution does not violate Plaintiffs' constitutional rights, and the court ignored the entirety of Plaintiffs' evidence documenting the District teachers' ongoing harm. We reverse the court's order denying Plaintiffs' motion for a preliminary injunction as to the Resolution's implementation and enforcement.

Plaintiffs also seek to enjoin the Board's implementation of "Policy 5020.01" (the Policy), which requires school staff to notify parents of any District student who requests to be identified or treated as being of a gender other than their biological sex. Assembly Bill No. 1955 (2023–2024 Reg. Sess.) (Assembly Bill 1955) recently amended the Education Code to prohibit such school board policies. (Stats. 2024, ch. 95, §§ 5–6; Ed. Code §§ 220.3, 220.5.) Since the change in law, the Board rescinded the portions of the Policy at issue in this appeal. Accordingly, we dismiss as moot Plaintiffs' appeal as to the Policy.

FACTS

I.

THE RESOLUTION

The Board enacted the Resolution in December 2022. The Resolution stated that "racism has no place" in the District, and rather than "imposing the responsibility of historical transgressions," it would instead "engage students of all cultures in age-appropriate critical thinking that helps students navigate the past, present, and future." The Resolution quoted Dr. Martin Luther King, Jr., and then declared, "[CRT] is an ideology based on false assumptions about the United States of America and its population . . . [¶] . . . [¶] [CRT] is a divisive ideology that assigns moral fault to individuals solely on the basis of an individual's race and, therefore, is

5

itself a racist ideology." The Resolution stated that CRT "assigns generational guilt and racial guilt for conduct and policies that are long in the past." The Resolution instructed "[CRT] *or other similar frameworks* will not be used as a source to guide how topics related to race will be taught." (Italics added.)

Finally, the Resolution listed five "elements of [CRT]" and eight "doctrines derived from [CRT]" which educators are prohibited from teaching. The elements are:

> "1. Racism is racial prejudice plus power, a concept that is often used to argue that (i) only individuals classified as 'white' people can be racist because only 'white' people control society and (ii) individuals in ethnic minorities cannot be racist because they do not control society.

> "2. Racism is ordinary, the usual way society does business.

> "3. 'Interest convergence' or 'material determinism', according to which the incentive to move away from racist policies depends primarily on the self-interest of the oppressor class, i.e. 'whites'.

> "4. 'Differential racialization', according to which the 'dominant society racializes different minority groups at different times, in response to different needs such as the labor market'[.]

> "5. The 'voice-of-color' thesis, according to which merely 'minority status . . . brings with it a presumed competence to speak about race and racism', a concept often used to discredit opposing arguments on the basis of the opposing person's race[.]" (Fns. omitted.)

The eight doctrines are listed as follows:

> "a. An individual, by virtue of his or her race or sex, is inherently racist and/or sexist, whether consciously or unconsciously.

> "b. Individuals are either a member of the oppressor class or the oppressed class because of race or sex.

6

"c. An individual is inherently morally or otherwise superior to another individual because of race or sex.

"d. An individual should be discriminated against or receive adverse treatment due to the individual's race or sex, or an individual should receive favorable treatment due to the individual's race or sex.

"e. An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past or present by other members of the same race or sex.

"f. An individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex.

"g. Meritocracy or traits such as, but not limited to, a hard work ethic or the scientific method are racist or sexist or were created by members of a particular race to oppress members of another race.

"h. The advent of slavery in the territory that is now the United States constituted the true founding of the United States, or the preservation of slavery was a material motive for independence from England."

The Resolution ended with the final prohibition that "social science courses can include instruction about [CRT], provided that such instruction plays *only a subordinate role* in the overall course and provided further that such instruction *focuses on the flaws* in [CRT]." (Italics added.)

The Resolution was silent as to a reporting or enforcement mechanism and as to possible repercussions should an educator violate the Resolution. A separate school board policy specified that "[a]ny employee who permits or engages in prohibited discrimination . . . shall be subject to disciplinary action, up to and including dismissal." The Resolution stated CRT "is itself a racist ideology." Read in conjunction with each other, some

educators feared that a Resolution violation—even if unintentional—could result in their termination.

## II.

### THE POLICY

In August 2023, the Board enacted the Policy. The Policy required certain school staff to notify District students' parents in writing within three days of any District employee becoming aware that a student was:

(a) "Requesting to be identified or treated as a gender (as defined in Education Code Section 210.7) other than the student's biological sex or gender listed on the student's birth certificate or any other official records.

"This includes any request by the student to use a name that differs from their legal name (other than a commonly recognized diminutive of the child's legal name) or to use pronouns that do not align with the student's biological sex or gender listed on the student's birth certificate or other official records."

(b) "Accessing sex-segregated school programs and activities, including athletic teams and competitions, or using bathrooms or changing facilities that do not align with the student's biological sex or gender listed on the birth certificate or other official records."

(c) "Requesting to change any information contained in the student's official or unofficial records."

## III.

### THE LITIGATION

In October 2023, Plaintiffs sued Defendants alleging ten counts of various constitutional and statutory violations pertaining to the Resolution and the Policy's enactment and enforcement. Plaintiffs filed a motion for a

preliminary injunction in November 2023,[2] which the trial court ultimately denied.

*A. Plaintiffs' Evidence in Support of Injunctive Relief*

Plaintiffs attached as exhibits to their motion for a preliminary injunction voluminous records proffered to demonstrate how the Resolution is at-odds with state education requirements and that teachers are confused by the Resolution's sweeping mandate. We narrow our summary to the records relevant to the vagueness claim and the balance of harms analysis.

1. State Education Requirements

Plaintiffs attached records from the California Department of Education to demonstrate relevant state education requirements. These include the kindergarten through grade twelve public schools frameworks for history and social sciences (HSS), arts education, mathematics, health education, science, and world languages, as well as the HSS content standards. The HSS content standards mandated that eleventh graders should be able to "analyze the development of federal civil rights and voting rights," including seminal cases like *Dred Scott v. Sandford* (1857) 60 U.S. 393, *Plessy v. Ferguson* (1896) 163 U.S. 537, *Brown v. Board of Education* (1954) 347 U.S. 483, and including "the roles of civil rights advocates" like Dr. Martin Luther King, Jr., and Malcom X. And they must examine the significance of Dr. Martin Luther King, Jr.'s "Letter from a Birmingham Jail" and "I Have a Dream" speech. Eleventh graders must also "[d]iscuss the diffusion of the civil rights movement of African Americans from the churches of the rural South and the urban North, including the resistance to racial

---

[2] The parties litigated other motions and a demurrer, none of which are pertinent to this appeal's subject matter.

9

desegregation in Little Rock and Birmingham, and how the advances influenced the agendas, strategies, and effectiveness of the quests of American Indians, Asian Americans, and Hispanic Americans for civil rights and equal opportunities."

These students must also "analyze the major social problems and domestic policy issues in contemporary American society," including "the changing roles of women in society," "the reasons for the nation's changing immigration policy," and "the persistence of poverty and how different analyses of this issue influence welfare reform, health insurance reform, and other social policies."

The HSS framework stated that ninth graders should learn about ethnic studies, which "is an interdisciplinary field of study that encompasses many subject areas including history, literature, economics, sociology, anthropology, and political science . . . . [¶] As a field, ethnic studies seeks to empower all students to engage socially and politically and to think critically about the world around them. It is important for ethnic studies courses to document the experiences of people of color in order for students to construct counter-narratives and develop a more complex understanding of the human experience. . . . [¶] . . . [C]entral to any ethnic studies course is the historic struggle of communities of color, taking into account the intersectionality of identity (gender, class, sexuality, among others), to challenge racism, discrimination, and oppression and interrogate the systems that continue to perpetuate inequality." Ninth grade teachers should hold a discussion inquiring: "How have race and ethnicity been constructed in the United States, and how have they changed over time? [¶] How do race and ethnicity continue to shape the United States and contemporary issues?"

The health education framework instructed health educators to "[a]ddress implicit and explicit racial bias, and if racially-charged topics occur, do not ignore them. Students may benefit from a class meeting or seminar in which they have an opportunity to discuss issues dealing with racial inequities or dynamics as they relate to health education topics."

Plaintiffs also included an expert declaration from Dr. Rita Kohli and Dr. Marcos Pizarro (researchers, educators, and authors specializing in the intersection of race and education) who discussed California "Standards for the Teaching Profession" and the state's "Teaching Performance Expectations" (TPEs). They stated that "[t]o obtain a teaching credential in California [the TPEs require] teachers [to] demonstrate their ability to create a culturally responsive classroom environment in which all students can engage in critical inquiry and develop mastery of the knowledge and skills set out in the state's academic content standards." The TPEs stated that HSS teachers are expected to "'teach students how cultural perspectives inform and influence understandings of history'; [¶] 'design activities to illustrate multiple viewpoints on issues'; [¶] [']create classroom environments that support the discussion of sensitive issues (e.g. social, cultural, race, and gender issues)'; [¶] 'ask questions and structure academic instruction to help students recognize implicit and explicit bias and subjectivity in historical actors'; and [¶] 'relate [HSS] content to broader contextual understandings so that students better understand their current world.'" (Fns. omitted.)

2. Instances of Teachers' Confusion and Fear

Since the Resolution's enactment, District teachers and members of the Association have expressed confusion and concern for their students' education and their ability to properly do their job without reprimand or termination. Plaintiffs submitted 11 plaintiffs' declarations, one declaration

11

from the Association president, and 10 expert witness declarations. Plaintiffs also attached exhibits delineating various teaching requirements set by the California Department of Education and materials from various Board meetings. We narrow our summary of Plaintiffs' evidence here to evidence relevant to their vagueness claim.

The Association's president, Edgar Diaz, wrote in his declaration that the Association encompassed 32 schools and advocated for 1,425 public education professionals who served approximately 30,000 students. He stated that "[s]ince the Board's adoption of the Resolution, the vast majority of [Association] meetings have dealt with addressing the Resolution, and particularly to supporting teachers who fear losing their livelihoods if they are accused of violating it." He also explained the Association members are being harmed by the Resolution because it made it "impossible for [the Association] educators to meet their professional obligations to their students" and teach state and district mandated concepts. The educators have "had to change their lesson plans[,] stop teaching books that address racial and other forms of inequality[,] censor their instruction and their answers to student questions on standards-mandated topics[,] and limit classroom conversations to avoid being reported."

Amy Eytchison, a fourth grade District teacher and plaintiff, stated in her declaration the Resolution has had an enormous negative impact on her teaching. She expressed concern and confusion about how to adequately teach the content standards without violating the Resolution. For example, she is supposed to teach about "how labor during the mission period harmed Native American communities, how controversies over the expansion of slavery impacted California's bid for statehood, and how hostility toward Chinese and Japanese laborers led to anti-Asian exclusion movements." "It is

12

unclear to [her] how to facilitate discussions with integrity about these topics without acknowledging . . . individuals were members of an oppressed group by virtue of their race," or that "'the dominant society racializes different minority groups at different times, in response to different needs such as the labor market,'" as prohibited under doctrine (b) and element four of the Resolution.

Eytchison noted she did not know what a permissible response was when her students asked her how and why slavery happened. She feared her answer could mistakenly imply "'an individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race,'" which would violate doctrine (f) in the Resolution.

Eytchison stated that "[she did] not want to face professional consequences for such a misunderstanding" and had experienced anxiety in the classroom due to uncertainties of what is permissible to discuss. As a result of the uncertainties, Eytchison stated she self-censored her teaching and wholly avoided topics she would otherwise teach. "Prior to the Resolution, [she] could speak openly with [her] students about competing interpretations of historical events and their current impacts, but now [she was] inclined to avoid such conversations."

A declaration from sixth grade District teacher and plaintiff Katrina Miles stated that the Resolution impacted the information available to students at her school. She regularly taught the book *Roll of Thunder, Hear My Cry*, by Mildred Taylor, and was the only teacher to continue teaching it after the Resolution passed. Since the Resolution, however, she "avoided using group terms like 'white,' and [she] strictly adhered to the text of the book to avoid making any suggestions or sharing any of [her] own perspectives with the students [because she did] not want to be misquoted or

13

face the consequences of being reported to the highly partisan Board members."

Declaration from plaintiff and District high school world history and United States government teacher, Dawn Sibby, stated that she read the Resolution multiple times and attended Board meetings to try to understand what it restricted, but has been "unable to discern what specific topics and conduct [would] be found to violate them." The Resolution's unclear scope caused Sibby further confusion because "despite being phrased primarily in terms of race, the Resolution also place[d] restrictions on non-racial topics such as discrimination based on sex."

Sibby struggled with complying with California education standards and the Resolution, which are in conflict. For example, the HSS content standards required teaching about "'the controversies that have resulted over changing interpretations of civil rights,' including in *Plessy v. Ferguson* and *United States v. Virginia*," and how European powers "'justified their conquests by asserting arguments of racial hierarchy and cultural supremacy, offering a vision of civilization in contrast to what they argued were 'backward' societies.'" But Sibby worried that complying with the HSS content standards would also "cause some students to feel discomfort," or that she would use the "'wrong'" language and be reported and disciplined. She lamented that "[she did] not know how to meet this requirement without teaching that individuals have experienced discrimination on the basis of race and sex. These discussions have to engage with topics of racism and sexism, which some students have directly experienced."

Sibby noted that "[t]he Resolution's lack of clear enforcement standards [made] the danger of a misstep even greater. . . . [T]he Resolution itself provide[d] no information on how the Board [would] decide what

14

penalties to impose for purported violations" because it would be totally discretionary.

Declaration of plaintiff and District high school English teacher, Jennifer Scharf, stated that "since [the Resolution's] enactment, [she had] been inundated with questions from [teachers] about what books and ideas they can and cannot teach," including "whether the Resolution permit[ted] them to continue assigning Toni Morrison's *Beloved*, and if so, how they [could] meaningfully teach the novel without talking about racial oppression and its lasting impacts." After teaching lawyer Bryan Stevenson's memoir *Just Mercy*, Scharf "felt awful" not discussing persistent inequalities, drawing connections to current events, or answering students' questions about failures in the criminal justice system in order to comply with the "vague definition of '[CRT].'"

*B. Defendants' Evidence in Opposition*

Defendants' evidence in opposition to Plaintiffs' motion for a preliminary injunction included defendant and Board member Joseph Komrosky's declaration and the Board's policy No. 6144 (Policy 6144), which addressed "controversial issues" in the classroom.

Komrosky's declaration reiterated that the Board's stated intent for implementing the Resolution was "to protect all students from racism and sexism" and "to ensure that students of color receive an education equivalent to that of their white peers." His declaration mirrors much of the Resolution and Policy 6144, at times reciting them verbatim. He stated that "[t]he Resolution [did] not interfere with the teaching of ethnic studies, history, or any other subject, nor [was] it antithetical to the teaching of ethnic studies. Teachers [could] still teach on accurate historical events and individuals, such as Dr. Martin Luther King, the Holocaust, and slavery."

15

As to its clarity, Komrosky stated that "[i]n the Resolution, we made an intent to include numerous doctrines and tenets to ensure all students and teachers understood the Resolution. We used precising definitions, to avoid vagueness and ambiguity. This can be seen in the five elements and eight doctrines listed."

Komrosky pointed to Policy 6144, which he attached as an exhibit to his declaration, stating it is a corollary to the Resolution and provides guidelines when discussing racism and CRT in the classroom. Policy 6144 "require[d] teachers to ensure that all sides of a controversial issue [were] impartially presented with adequate and appropriate factual information" and "help students separate fact from opinion and warn them against drawing conclusions from insufficient data." It guarantees students the right to "study any controversial issue which has political, economic, or social significance"; "to have free access to all relevant information"; and "to study under competent instruction in an atmosphere free from bias or prejudice."

*C. Ruling*

The trial court heard both parties' arguments at the preliminary injunction motion hearing and issued a written order denying Plaintiffs' motion.

As to vagueness, the trial court concluded that "the [R]esolution [wa]s sufficiently definite to provide notice of the conduct proscribed and standards of application[,] in that the Resolution specifically delineates what 'cannot be taught[,]'" referring to the 13 prohibited concepts derived from CRT. The court noted "that a person of ordinary intelligence would have a reasonable opportunity to know what is prohibited[,] as what is prohibited is set out specifically in the Resolution." The court found Plaintiffs were "not likely to succeed on the merits."

16

As to the balancing of harms, the trial court concluded that because Plaintiffs' constitutional rights were not infringed, enjoining a legitimate government action would cause a form of irreparable injury. The court concluded the balance of harms, thus, weighs in favor of denying the motion for a preliminary injunction. The court did not discuss the Plaintiffs' alleged harm with the Resolution in effect. Plaintiffs timely appealed.

DISCUSSION

On appeal, Plaintiffs contend the trial court erred in denying injunctive relief. They argue the Resolution is unconstitutionally vague on its face, such that they are likely to succeed on the merits, and the harm they would incur without an injunction exceeds the purported harm Defendants would face with an injunction. We agree.

I.

PRELIMINARY INJUNCTION FACTORS AS TO THE RESOLUTION

A preliminary injunction preserves the status quo until a trial court makes an ultimate determination of a claim's merits. (*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2024) 106 Cal.App.5th 982, 992.) A trial court considers two interrelated factors when determining whether to issue a preliminary injunction: "(1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief. [Citations.]" (*Tulare Lake*, *supra*, 92 Cal.App.5th at p. 396.) These two factors "are described as *interrelated* factors because the greater the plaintiff's showing on one, the less must be shown on the other to obtain an injunction. [Citation.] The goal of this test is to minimize the harm that an erroneous interim decision would cause. [Citations.]" (*Id.,* at pp. 396–397.)

17

*A. Standard of Review*

We review a trial court's denial of a preliminary injunction for abuse of discretion, leaving the decision undisturbed unless it "exceeds the bounds of reason by being arbitrary, capricious[,] or patently absurd." (*Dodge, Warren & Peters Ins. Services, Inc. v. Riley* (2003) 105 Cal.App.4th 1414, 1420.) But we review questions of law de novo. (*People ex rel. Feuer v. FXS Management, Inc.* (2016) 2 Cal.App.5th 1154, 1159.) "Constitutional issues are always reviewed de novo." (*Vo v. City of Garden Grove* (2004) 115 Cal.App.4th 425, 433 (*Vo*).)

We accordingly apply de novo review to the likelihood of success on the merits inquiry (the first factor) because we are tasked with considering whether the Resolution is unconstitutionally vague on its face. And we review the balance of harms (the second factor) for abuse of discretion. "Of course, enjoining enforcement of a constitutional ordinance, or failing to enjoin enforcement of an unconstitutional ordinance, would also constitute an abuse of discretion within the usual formulation of the standard of review for the grant or denial of a preliminary injunction." (*Vo*, *supra*, 115 Cal.App.4th at p. 433.)

*B. Likelihood of Success on the Merits (the First Factor)*

First, we review de novo whether Plaintiffs made a sufficient showing that they are likely to succeed on the merits of their claim that the Resolution is unconstitutionally vague on its face (as opposed to an as applied challenge). Because the Resolution's language is ambiguous, lacks definitions, is unclear in scope, is seemingly irreconcilable with state-mandated educational requirements, and contains no enforcement guidelines, we find the Resolution unconstitutionally vague.

Plaintiffs accurately argue that the Resolution bans 13 unclear concepts and "prohibits teaching '[CRT] or other similar frameworks' without bothering (i) to identify those frameworks or (ii) to explain what makes a framework 'similar' to [CRT] (and thus verboten)."

Defendants contend the Resolution is sufficiently clear in its prohibition of five elements of CRT and eight doctrines derived from CRT. They argue that ""perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity,"" quoting *Raef v. Appellate Division of Superior Court* (2015) 240 Cal.App.4th 1112, 1138. Defendants argue that Plaintiffs "complicate the interpretation of the Resolution, creating unnecessary confusion about its scope."

The void-for-vagueness doctrine "derives from the due process concept of fair warning" and "bars the government from enforcing a provision that 'forbids or requires the doing of an act in terms so vague' that people of 'common intelligence must necessarily guess at its meaning and differ as to its application.' [Citations.]" (*People v. Hall* (2017) 2 Cal.5th 494, 500 (*Hall*).) To survive a void-for-vagueness challenge, "(1) [t]he regulations must be sufficiently definite to provide fair notice of the conduct proscribed; and (2) the regulations must provide sufficiently definite standards of application to prevent arbitrary and discriminatory enforcement."[3] (*Snatchko v. Westfield LLC, supra*, 187 Cal.App.4th at p. 495.) We may consider other sources of law

---

[3] We note that the parties dispute whether we should apply the ordinary, two-part vagueness test or a heightened analysis requiring greater specificity where the vagueness quells the freedom of speech. (*Hynes v. Mayor of Oradell* (1976) 425 U.S. 610, 620.) We need not address whether the vagueness chills speech because we find the Resolution is unconstitutionally vague under the ordinary, two-part test.

to determine the terms' clarity, including "judicial construction of similar provisions." (*Hall*, *supra*, 2 Cal.5th at p. 500.)

"""To support a determination of facial unconstitutionality, voiding the statute as a whole, [Plaintiffs] cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute."' [Citations.]" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) "Rather, the 'minimum' our cases have accepted is a showing that the statute is invalid 'in the *generality* or *great majority* of cases.' [Citations.]" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 388.)

### 1. The Resolution's Text is Ambiguous

The Resolution's plain text is ambiguous and its scope unclear. Because CRT underpins the entire Resolution, a clear and commonly understood definition of CRT is crucial. The Resolution defined CRT as "a divisive ideology that assigns moral fault to individuals solely on the basis of an individual's race and, therefore, is itself a racist ideology." The Resolution operates as if this definition is universally accepted, but the text does not indicate where this definition is derived, or whether it is shared with anyone else besides the Board. This definition seems to represent the Board's subjective perception of CRT. Defendants rely on Komrosky's declaration for the position that the Resolution "used precising definitions, to avoid vagueness and ambiguity," but the Resolution is not sufficiently definite just because a Board member who enacted it stated as much.

Making matters worse, the Resolution does not provide any examples of CRT or how CRT intersects with school curriculum. Clear examples could have made the Board's definition of CRT more

understandable or, at the very least, could inform teachers about what they can and cannot teach.

Similarly, there are no guidelines for how a teacher should modify their curriculum, if at all. Defendants point out that Policy 6144 is meant to accompany the Resolution to aid teachers in discussing these "controversial topics" in their classroom, but we find this only confuses the issues further. Policy 6144 seems in conflict with the Resolution, rather than its corollary, because it requires educators to teach *any* controversial issue that has political, economic, or social significance, and requires them to provide students with *all* relevant information and ensure *all* sides are impartially presented. This seems to not just encourage instruction on intersectional and systemic racism, but to require it.

Another cause for concern is the prohibition of *other similar frameworks*. As discussed, we do not know what the Resolution meant when it referenced CRT, let alone frameworks similar to CRT. *Other similar frameworks* leaves open for interpretation whether a teacher could be unwittingly implicated for teaching a topic wholly separate from racial inequities, but that could be categorized as having a *similar framework* by whoever is interpreting the Resolution. Understandably, Sibby was similarly confused by the unclear scope, as she stated, "despite being phrased primarily in terms of race, the Resolution also places restrictions on non-racial topics such as discrimination based on sex." Is instruction on gender inequality also prohibited by the Resolution? Age discrimination? This creates obvious issues of interpretation, which leaves the Resolution enforcement subject to arbitrary practices.

When this issue was presented to Defendants' appellate counsel at oral argument, counsel replied that "other similar frameworks are

expanded within the Resolution . . . itself," and "similar frameworks would include and encompass the 13 elements and doctrines that are listed in the Resolution." Counsel's answer is not found in the Resolution's text, nor does it follow logically—if the Resolution is referring to the 13 elements and doctrines of CRT, why would it not simply say so rather than use the open-ended phrase, *other similar frameworks*?

The Resolution culminates with a confusing caveat that teachers *can* teach CRT if it is "subordinate" to the course and "such instruction focuses on the flaws of [CRT]." What are the flaws? The Resolution never explains. At oral argument, when asked what the flaws of CRT are, Defendants' appellate counsel replied, "At the risk of sounding redundant . . . the 13 doctrines and elements that are laid out would inherently be the flaws of critical race theory." But this is circular—if we adopt counsel's interpretation, then an educator can teach the prohibited concepts and elements if they focus on the prohibited concepts and elements.

2. Plaintiffs' Evidence Demonstrates Instances of Ambiguity

Aside from the issues that the Resolution's plain text presents, the District teachers have experienced anxiety and confusion in knowing what is prohibited by the Resolution and fear extreme repercussions without guardrails for even accidental violations.

Plaintiffs analogized their vagueness claim to *Santa Cruz Lesbian & Gay Cmty. Center v. Trump* (N.D.Cal. 2020) 508 F.Supp.3d 521 (*Santa Cruz*), which enjoined portions of President Trump's Executive Order No. 13950 as unconstitutionally vague, and *Local 8027 v. Edelblut* (D.N.H. 2023) 651 F.Supp.3d 444 (*Local 8027*), which found a state statute prohibiting public school teachers from teaching divisive concepts to be unconstitutionally vague. We are, of course, not bound by an intermediate

22

federal court's decisions (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 579), but such decisions may nevertheless be instructive (*id.*, at p. 580).

In *Santa Cruz*, President Trump issued an executive order that prohibited teaching certain "'divisive concepts'" in federal agency diversity trainings. (*Santa Cruz, supra,* 508 F.Supp.3d at p. 529.) The executive order defined "'divisive concepts'" as, in relevant part, "'(1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; . . . (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race." (*Ibid.*)

The district court found that the executive order's divisive concepts were unconstitutionally vague. (*Santa Cruz, supra*, 508 F.Supp.3d at pp. 530, 544–545.) In determining whether the executive order "provided ample exceptions, limitations and safeguards to ensure that a person of ordinary intelligence had 'fair notice of what conduct is prohibited' [citation.]" (*id.*, at p. 544), the court considered Plaintiffs' declarations (*id.*, at pp. 543–544). The declarations emphasized that work "trainings on unconscious bias [was] critical to Plaintiffs' missions and their work." (*Id.*, at p. 543.) They described the difficulty they were having knowing whether they were violating the executive order by continuing their job duties, which included

23

training health care professionals to provide affirming care to their LGBT patients. (*Id*., at pp. 543–544).

The district court noted that the "'[d]ue process clause does not require impossible standards of clarity,' [Citation.]" but concluded the executive order contained "no such guardrails" (*Santa Cruz, supra*, 508 F.Supp.3d at p. 544), and "the Government's own interpretation of the reach of [the executive order] provide[d] even more uncertainty about the scope of prohibited conduct" (*ibid*).

*Santa Cruz* is instructive, and we adopt the district court's analysis. The Resolution's eight doctrines derived from CRT are *nearly identical* to the *divisive concepts* defined in the executive order. The court in *Santa Cruz* found the Plaintiffs' declarations persuasive to support that facially vague challenge, where they described how the executive order's ambiguity impacted their work and understanding of whether they were violating the executive order.

Similarly, the teachers are confused by the Resolution's prohibited concepts, unsure of the listed concepts' meanings or application to their curriculum, and unsure how to comply with the Resolution and their state-mandated instruction. Eytchison stated that she was uncertain what was permissible to discuss in the classroom. She did not know how to answer her students' questions about how and why slavery happened without mistakenly implying that "an individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race." Miles stated that she avoided using the term "white" when teaching about a book that involved race to ensure compliance with the Resolution. Sibby made efforts to understand the Resolution and attended Board meetings but

24

was still "unable to discern what specific topics and conduct [would] be found to violate" the Resolution.

This is the exact situation the void-for-vagueness doctrine seeks to ameliorate. Teachers are left to self-censor and potentially overcorrect, depriving the students of a fully informed education and further exacerbating the teachers' discomfort in the classroom. Rather than lead the classroom and moderate healthy discussion, the teachers are forced to leave children's questions unanswered or potentially let a classroom conversation about race devolve out of fear that their intervention would trigger a Resolution violation.

The Association president Diaz wrote in his declaration that the Resolution made it impossible for teachers to meet professional obligations and teach mandated concepts. Sibby exemplified this struggle, noting she was required by the state to teach about "'the controversies that have resulted over changing interpretations of civil rights,' including in *Plessy v. Ferguson* and *United States v. Virginia*." She worried this would violate the Resolution, she would use the "'wrong'" language, and she would be subject to discipline.

In *Local 8027, supra*, 651 F.Supp.3d 444, a district court found a state statute that prohibits educators from teaching four "concepts" (*id.*, at p. 447) related to race to be vague on its face (*id.*, at p. 464). Three of the concepts mirror the Resolution's "doctrines derived from [CRT]" at issue in this appeal. The *Local 8027* court posited several instances in which a teacher may unintentionally violate the statute: "[f]or example, beyond teaching the historical existence of Jim Crow laws, teachers are supposed to discuss their evolution and how such practices can be prevented. In this context, it is not difficult to imagine that a discussion of remedies for past

discrimination such as reparations would take place, which could subject a teacher to sanctions for teaching a banned concept." (*Id.*, at p. 462.) The district court found it concerning since teachers "have an affirmative duty to teach topics that potentially implicate several of the banned concepts." (*Ibid.*)

We find *Local 8027* analogous given the textual similarities in the statute's prohibited *concepts* and the Resolution's prohibited *doctrines*. We find it instructive that the district court also took issue with the difference between teaching the historical facts about Jim Crow laws and holding a discussion about past discrimination and remedies such as reparations. This exact inquiry was posited by the Plaintiffs both in their motion for injunctive relief and in their appellate briefing. Plaintiffs raised the issue because Education Code section 51220, subdivision (b)(1), mandates that teachers "provide a foundation for understanding . . . human rights issues, with particular attention to the study of the inhumanity of genocide, slavery, and the Holocaust, . . . and contemporary issues." But could a teacher be disciplined if their lesson on Jim Crow laws, and still-prevalent contemporary racial issues, causes a student to perceive that "[a]n individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race"? Or if the lesson covers implicit racial bias? If a teacher of color shares a personal anecdote exemplifying modern ramifications of the Jim Crow era, could they be disciplined for teaching that "merely 'minority status . . . brings with it a presumed competence to speak about race and racism'"?

In their appellate briefing, Defendants state that "[t]he Resolution does not ban discussions on slavery, historical figures (i.e., Jim Crow), or the human rights issues concerning such topics." Rather, it "prohibits leading a discussion that '[a]n individual, by virtue of his or her

26

race or sex, is inherently racist and/or sexist, whether consciously or unconsciously' or that '[a]n individual is inherently morally or otherwise superior to another individual because of race or sex.'" We find this confusing because Jim Crow was not a "historical figure," but a pejorative term referring to a Black man, derived from a musical caricature of a Black man played by a white man in blackface.[4] Also, students are not merely taught historical facts about Jim Crow laws, but rather about the discriminatory Jim Crow laws era, segregation, subsequent racial inequities in the criminal system, socio-economic divide, and an ideological rift that contributed to the civil rights movement. These lessons could potentially violate the Resolution, as discussed above.

In a similar disagreement, Plaintiffs raised the question whether teachers would be subject to a violation if they instruct on Dr. Martin Luther King, Jr.'s "Letter from a Birmingham Jail," which is required teaching by the California Department of Education for eleventh graders. Plaintiffs posit that because Dr. Martin Luther King, Jr. criticized white moderates for their inaction in the letter, an educator teaching this lesson could violate the Resolution if someone perceived that "[a]n individual, by virtue of his or her race . . . bears responsibility for actions committed in the past or present by other members of the same race."

Defendants in their reply state that "[n]othing in the language prohibits teaching that *Dr. King believed* white moderates were failing to support the civil rights movement and have discussion on the topic." We are

---

[4] Despite discussing Jim Crow in Defendants' appellate briefing, Defendants' appellate counsel stated at oral argument that she believed Jim Crow was "a civil rights individual."

still left to guess whether a teacher could face repercussions if they suggest in their instruction on this topic that white moderates, in fact, failed to support Dr. Martin Luther King, Jr., and the civil rights movement, or if the Resolution requires they only teach that this was Dr. Martin Luther King, Jr.'s *belief*.

It is clear from the Resolution's text and the record evidence that Plaintiffs' constitutional right to fair warning about what conduct is forbidden has been impinged. (*Hall*, *supra*, 2 Cal.5th at p. 500.) The language lacks definition and clarity and leaves the reader to guess the meaning of the Resolution's terms and enumerated prohibitions. (*Ibid.*)

3. The Resolution is Silent About Enforcement

The district court in *Local 8027* found a great importance for teachers to have fair notice of what conduct constitutes a violation because they could be subject to termination or losing their teaching credentials (*Local 8027*, *supra*, 651 F.Supp.3d at p. 462), without a clear scienter requirement (*id.*, at p. 460). The court found the statute's enforcement procedural safeguards deficient because the California Department of Education would be required to investigate every possible case reported by anyone. (*Id.*, at p. 463.)

The Resolution similarly exposes educators that incur a violation to potentially lose their job, even where the teacher commits a violation incidentally. The Resolution does not even include a reporting scheme or any procedural safeguards to protect against arbitrary or discriminatory enforcement. The silence leaves us, and the teachers, with many questions. What is the reporting process for perceived violations? Is there an investigation procedure? Will their right to fair notice and hearing be upheld? Will they have a union representative at the hearing? Who determines

28

whether a teacher violated the Resolution? What is the burden of proof at the hearing? Is the potential punishment a verbal warning or loss of their teaching credentials? Who determines the repercussion? The Resolution is unconstitutionally vague because it is devoid of any guideline for its application, which leaves it vulnerable to "arbitrary and discriminatory enforcement." (*Snatchko v. Westfield LLC*, *supra*, 187 Cal.App.4th at p. 495.)

*C. Balance of Harms (the Second Factor)*

Next, we consider whether the trial court abused its discretion when it found the balance of harms weighed in favor of denying injunctive relief.

Plaintiffs contend the trial court erred when it concluded the Resolution did not violate their constitutional rights and when it failed to consider the harms outlined in the numerous declarations. Plaintiffs argue the balance of harms weighs in favor of injunctive relief because teachers across the district "face severe, even career-ending penalties for guessing incorrectly whether the Resolution's ill-defined provisions permit or prohibit instruction on a given topic," among other alleged harms. Plaintiffs also cite to *Ketchens v. Reiner* (1987) 194 Cal.App.3d 470, arguing that infringements on the Plaintiffs' constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury" (*id.* at p. 480). Plaintiffs argue that, in contrast, Defendants would suffer no harm should the status quo be maintained.

Defendants argue, and the trial court agreed, that the Resolution does not violate Plaintiffs' constitutional rights. Defendants state that "[Plaintiffs] cannot enjoin a statute out of fear alone" and that the Plaintiffs' claims are "'wide-ranging, conclusory, and unfocused,'" and thus permit the court to deny a preliminary injunction, citing *Harmon v. City of Norman,*

29

*Oklahoma* (10th Cir. 2020) 981 F.3d 1141, 1150). Defendants contend that an injunction would "deprive[] children of a public education crafted out of the District's democratic process and policy judgments." And finally, Defendants cite to *Maryland, supra*, 567 U.S. at page 1303, for the premise that "'[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.' [Citation.]"

The balance of harms section in the trial court's written order denying injunctive relief only addressed the potential harm Plaintiffs faced without the injunction. The court relied on the same premise in *Maryland* as Defendants, and concluded "the balance of harms weighs in favor of denying the request for a preliminary injunction as to . . . the Resolution." Because the court's analysis was conclusory, premised on the incorrect conclusion that the Resolution did not violate Plaintiffs' constitutional rights, and lacked consideration of Plaintiffs' proffered record evidence, we find the court abused its discretion. (*Dodge, Warren & Peters Ins. Services, Inc. v. Riley*, *supra*, 105 Cal.App.4th at p. 1420.)

Although the second factor in the preliminary injunction analysis is commonly referred to as *a showing of irreparable harm*, it is somewhat of a misnomer. Rather than solely requiring the plaintiff to show irreparable, irreversible harm as the colloquial reference implies, the trial court "compares the interim harm the plaintiff is likely to sustain if the injunction is denied to the harm the defendant is likely to suffer if the preliminary injunction is issued." (*Tulare Lake, supra*, 92 Cal.App.5th at p. 396.) Indeed, "'[i]rreparable harm' does not mean 'injury beyond the possibility of repair . . . .' [Citation.] "'[T]he word 'irreparable' is a very unhappily chosen one, used in expressing the rule that an injunction may issue to prevent

wrongs of a repeated and continuing character . . . .'" [Citation.]" (*Donahue Schriber Realty Group, Inc. v. Nu Creation Outreach* (2014) 232 Cal.App.4th 1171, 1184.)

Certainly, a plaintiff's showing of significant or irreparable harm weighs in their favor as the court conducts the balancing of harms analysis. Section 526 of the Code of Civil Procedure enumerates instances of harm that authorize a trial court to grant a preliminary injunction, including "great or irreparable injury." (Code Civ. Proc. § 526, subd. (a)(2).) But it also includes, as relevant here, when "a party to the action is doing . . . some act in violation of the rights of another party to the action respecting the subject of the action, and tending to render the judgment ineffectual" (*id.,* § 526, subd. (a)(3)), and when monetary relief "would not afford adequate relief" (*id.,* § 526, subd. (a)(4)).

1. Plaintiffs' Harm without Injunctive Relief

Rather than address the harms that Plaintiffs established in the record, the trial court stated the Resolution did not violate their constitutional rights. Not only is this an incorrect conclusion, as discussed *ante*, but is also an incomplete summary of Plaintiffs' harm submitted in the record. Indeed, the record included over 20 declarations in support of their motion for an injunction, all of which the court failed to address.

Pertinent to our review and narrowed to the harms from the Resolution's unconstitutional vagueness, the District teachers' various declarations collectively demonstrate ongoing stress since the Resolution's enactment. The evidence from declarants Diaz, Eytchison, Sibby, Miles, and Scharf establish that the teachers are struggling to comply with the Resolution because it is unclear and is seemingly at-odds with state

31

education requirements. They fear disciplinary action for mistakenly violating the Resolution.

Diaz explained, "[T]he vast majority of [Association] meetings have dealt with addressing the Resolution, and particularly to supporting teachers who fear losing their livelihoods if they are accused of violating it." This speaks volumes because the Association advocates for over 1,425 public education professionals. And it comports with the teachers' declarations, which specifically stated they do not know what will violate the Resolution and "lack of clear enforcement standards makes the danger of a misstep even greater."

Teachers are torn between providing students with lessons that meet state requirements and complying with the Resolution. Eytchison struggles to answer her students' questions about slavery for fear that she could be reported for inadvertently implying one of the enumerated prohibited elements or doctrines in the Resolution. She does not know how to comply with the Resolution while also teaching state-mandated topics related to labor exploitation, Native American communities, and the anti-Asian exclusion movements without violating the Resolution. Sibby is unsure how to teach about the controversies that have resulted over changing interpretations of civil rights and past civil rights United States Supreme Court cases or how to teach about European imperialism without discussing CRT or violating the Resolution's provisions.

Unsure of what conduct is prohibited and fearful of arbitrary enforcement, teachers are erring on the side of caution and self-censoring. Miles was the only teacher at her school to continue teaching *Roll of Thunder, Hear My Cry* after the Resolution's enactment, but she avoided using the term "white" in classroom discussions about the book to comply

with the Resolution. Eytchison no longer discusses "competing interpretations of historical events and their current impacts" with her students to avoid Resolution violations.

### 2. Defendants' Harm with Injunctive Relief

As for Defendants' harm should an injunction issue, the trial court relied on one sentence taken from *Maryland, supra,* 567 U.S. 1301. This is insufficient. In *Maryland*, a state statute permitted law enforcement to collect DNA from individuals charged but not yet convicted of certain offenses. (*Id.*, at p. 1301.) A Maryland Court of Appeal overturned a defendant's rape conviction after concluding the law violated the Fourth Amendment right to privacy. (*Id.*, at p. 1302.) The state applied for a stay of the judgment pending the United States Supreme Court's disposition of its petition for writ of certiorari. (*Ibid*.) The Supreme Court considered whether Maryland demonstrated "'a reasonable probability'" that the Supreme Court would grant certiorari, "'a fair prospect'" that the Supreme Court would reverse, and "'a likelihood that irreparable harm [will] result from the denial of a stay.' [Citation.]" (*Ibid*.)

By the time the Supreme Court considered irreparable harm, it had already found "a fair prospect that [the Supreme Court would] reverse the decision below" because the statute passed constitutional muster. (*Maryland, supra*, 567 U.S. at p. 1303.) The Supreme Court found there was sufficient record evidence that Maryland faced ongoing, irreparable harm to the state's "law enforcement and public safety interests" because the state "would be disabled from employing a valuable law enforcement tool for several months." (*Id.*, at pp. 1303–1304.) It considered that matches from the state's DNA swab program resulted in 58 criminal prosecutions, removing violent offenders from the general population. (*Id.*, at p. 1303.) The court

33

critically noted, "[the fact t]hat Maryland may not employ a duly enacted statute to help prevent these injuries constitutes irreparable harm." (*Ibid.*)

Defendants and the trial court alike assert that Plaintiffs failed to establish irreparable harm and quote *Maryland* for the premise that *any time* a court enjoins a government from employing a statute or resolution, they have incurred irreparable harm per se. We are mindful that a court enjoining a government's statute is "'a form of irreparable injury'" (*Maryland, supra*, 567 U.S. at p. 1303), but it is not a one-size-fits-all card. Indeed, if we accepted this premise as a blanket rule, then government rule-making bodies would avoid injunctions in every instance, even where, as here, its constituents' constitutional rights were at stake. In contrast to *Maryland*, we have found the Resolution does not pass constitutional muster. Certainly, a court may enjoin unconstitutional acts. (Code Civ. Proc., § 526, subd. (a)(3); *Vo, supra*, 115 Cal.App.4th at p. 433 ["failing to enjoin enforcement of an unconstitutional ordinance[] would also constitute an abuse of discretion within the usual formulation of the standard of review for the grant or denial of a preliminary injunction"].)

Further, the record here does not similarly show that Defendants would face any harm should an injunction issue. This ties back into the first factor about vagueness. The ambiguity and politicized spectacle surrounding CRT compounds the issues. What racist ideologies and other similar frameworks have the District's school children been subjected to that warrant the Resolution and denial of an injunction? It seems if these students have been subjected to such racist ideology all this time, there would be evidence in the record establishing as much. But significantly, Defendants' appellate counsel conceded at oral argument that there is *no* evidence that any of the

Resolution's enumerated elements or concepts of CRT have ever been taught in District schools.

Instead, aside from their argument aligning their case to *Maryland*, the only evidence of harm Defendants refer to is the Resolution itself and Komrosky's declaration. The Resolution asserts without support or examples that "[CRT] assigns generational guilt and racial guilt for conduct and policies that are long in the past" and "assigns moral fault to individuals solely on the basis of an individual's race." Komrosky's declaration reiterates the Resolution's goals and vouches for its constitutionality. Neither adequately articulate what CRT is, how it is implemented in the District's teachings, or how it harms its students, teachers, staff, or the public interest. What is harmful about the status quo should the preliminary injunction issue?

We conclude the trial court abused its discretion when it failed to consider any of Plaintiffs' evidence. We find Plaintiffs provided significant evidence of compelling harm, especially when weighed against Defendants' devoid record and unspecified harm.

We reverse the trial court's order denying injunctive relief solely as to the Resolution.

## II.

### THE POLICY ISSUE IS MOOT

Plaintiffs allege the trial court erred in denying the motion for a preliminary injunction as it relates to the Policy. Plaintiffs argue the Policy violates the equal protection clause because it unconstitutionally discriminates against gender nonconforming students on the basis of gender and sex. Defendants contend that the Policy applies to cisgender and gender nonconforming students equally, and therefore, the Policy passes rational

35

basis review because the Board has an interest in ensuring parents receive information about their child to protect children.

Assembly Bill 1955[5] became effective January 1, 2025. (See Stats. 2024, ch. 95.) The statute bars "[a]n employee . . . of a school district [from being] required to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law." (Stats. 2024, ch. 95, § 5; Ed. Code, § 220.3, subd. (a).) Assembly Bill 1955 states that "[a] school district . . . , or a member of the governing board of a school district . . . , shall not enact or enforce any policy . . . that would require an employee . . . to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law." (Stats. 2024, ch. 95, § 6; Ed. Code, § 220.5, subd. (a).) And "[a]ny policy . . . that is inconsistent with subdivision (a) is invalid and shall not have any force or effect." (Stats. 2024, ch. 95, § 6; Ed. Code, § 220.5, subd. (c).)

We ordered the parties to submit supplemental briefs in light of Assembly Bill 1955. Plaintiffs informed us that the California Department of Education (Department) issued an investigation report that found the Policy violates Education Code section 220's prohibition against discrimination.[6]

---

[5] Assembly Bill 1955 is codified in Education Code sections 217, 220.1, 220.3, and 220.5.

[6] Plaintiffs request we take judicial notice of supplemental exhibits A through G. We take judicial notice of exhibit A (Board meeting minutes, Jan. 28, 2025) and exhibit D (Department investigation report) (Evid. Code, §§ 452, 459; Cal. Rules of Court, rule 8.252) but decline to take judicial notice of the remaining exhibits as irrelevant (Evid. Code, § 210).

36

The Department's report instructed the District to not implement paragraphs (1)(a) and (b) of the Policy and to notify the employees and parents/guardians that the Policy will not be implemented. Both parties informed us that the Board rescinded paragraphs (1)(a) and (b) of the Policy on December 17, 2024.[7] Plaintiffs notified us that, "[d]ue to the rescinding of [the Policy]," the Board drafted a new policy "as a starting point to accomplish the objectives of the rescinded policy in the correct manner." There is no evidence that the new policy is in effect or whether the text is the same as the original.

Defendants contend that the constitutional claim against the Policy is moot given the relevant portions are rescinded. Plaintiffs argue the issue is still a live controversy because the Board's "actions establish a 'reasonable expectation' that the Board will persist in its unlawful conduct," citing *Center for Local Government Accountability v. City of San Diego* (2016) 247 Cal.App.4th 1146, 1157, in that it intends to enact the same or similar Policy.

It is well settled that we only decide actual, live controversies. (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 226.) A case is moot where, although it originally presented a justiciable controversy, an intervening event occurs which renders it impossible for the court to grant the party effectual relief. (*Id.*, at p. 227.) "This rule has been regularly employed where injunctive relief is sought and, pending appeal, the act sought to be enjoined has been performed." (*Ibid.*)

---

[7] Defendants request that we take judicial notice of their supplemental exhibits 1 through 5. We take judicial notice of exhibit 1, which evidences the rescinded portions of the Policy. (Evid. Code, §§ 452, subd. (b), 459; Cal. Rules of Court, rule 8.252.) We decline to take judicial notice of the remaining exhibits as irrelevant (Evid. Code, § 210).

We agree with Defendants that this appeal related to the Policy's constitutionality is moot given the relevant portions of the Policy are rescinded. At oral argument, Defendants' appellate counsel represented to us that the current Board consists of different Board members, and they do not intend to adopt a similar policy or related policy. We are mindful that Plaintiffs desire a finding of unconstitutionality to prevent future enactment of a similar provision, but the record does not show there is a new policy in effect, nor does it show us the text of a proposed future policy. We presume the Board will act in good faith and follow the law. Indeed, "'[t]he appellate court cannot render opinions "' . . . upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" [Citations.]' [Citation.]" (*Giles v. Horn, supra*, 100 Cal.App.4th at pp. 226–227.) We find the issue moot.

## DISPOSITION

We reverse the trial court's order as to the Resolution and remand for the court to issue a preliminary injunction. We dismiss the appeal related to the Policy as moot. Plaintiffs are awarded costs on appeal as the prevailing party. (Cal. Rules of Court, rule 8.278(a)(1).)

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

MOTOIKE, J.

38